**Sammy HIGGINS and Hazel Higgins, Appellants,**

v.

**DALLAS COUNTY CHILD WELFARE UNIT, Appellee.**

**No. 19047.**

Court of Civil Appeals of Texas, Dallas.

Nov. 29, 1976.

Rehearing Denied Dec. 16, 1976.

Sheila O'Connor, Dallas Legal Aid Society, Dallas, for appellants.

Henry Wade, Dist. Atty., Maridell Templeton, Asst. Dist. Atty., Dallas, for appellee.

CLAUDE WILLIAMS, Chief Justice.

Sammy Higgins and wife Hazel appeal from a judgment of the juvenile court in favor of Dallas County Child Welfare Unit in which the parent-child relationship between Sammy and Hazel Higgins and their child, Patrick Higgins, was terminated. Judgment was based on a jury verdict which found that Mr. and Mrs. Higgins had knowingly placed and knowingly allowed their son Patrick to remain in conditions and surroundings which endangered his physical well-being and that it would be in the best interest of the child for the parent-

child relationship to be terminated. The Higgins base their appeal upon the grounds that: (1) There is insufficient evidence to support the jury's finding that they knowingly placed or knowingly allowed Patrick to remain in physically dangerous surroundings; (2) there is insufficient evidence to support the jury finding that termination of the parent-child relationship is in Patrick's best interest; and (3) the court erred in framing the special issues in such a manner as to join both parents in each issue submitted thereby requiring the jury to answer special issues regarding both parents jointly instead of individually. We sustain appellants' first two contentions, and we reverse the trial court's judgment and remand the cause for further proceedings.

Sammy and Hazel Higgins were married June 20, 1973, in Houston. They are the parents of two children, Bryan and Patrick. The family has alternated living between Houston and Dallas. Sammy's employment record has been rather spasmodic. In view of the husband's irregular employment record, Hazel has been required to work at various jobs. While both parents were employed the children were left in the care and supervision of a neighbor. On November 4, 1973, while the family was living in Dallas, the mother noticed that Patrick has a swelling in both his hands and feet. She took Patrick to Parkland Hospital where he was admitted and his condition was diagnosed as an upper respiratory infection and anemia. Following treatment for this condition, the child was discharged from the hospital on November 14, 1973, at which time he was ambulatory. Patrick was again admitted to Parkland Hospital four days later, on November 18, when his mother noticed that he had a swollen knee. On this admission to the hospital, x-ray pictures were taken of the child's body, and the treating doctor diagnosed his condition as being multiple fractures of both legs in the vicinity of the knees. At that time neither parent offered any explanation of how the fractures had occurred nor gave a history of trauma suffered by the child. Consequently, a diagnosis was made that Patrick was the subject of "a possible battered child syndrome." He remained at Parkland Hospital until December 7, 1973, at which time he was delivered into the custody of the Dallas County Child Welfare Unit pursuant to court order. He has remained under the temporary managing conservatorship of this unit until December 15, 1975, when the parent-child relationship was finally terminated.

Dr. Ruth Norman, who became the primary treating physician of Patrick on his second admission to Parkland Hospital, testified that from the examination of the x-rays she determined that Patrick had suffered four fractures. She concluded from her examination that Patrick had no abnormalities which might have caused the bones to break without the application of force. The child, Patrick, was fifteen months old at that time. The doctor testified that she could not tell how or when the fractures occurred. She did not see or examine Patrick on his first admission to the hospital. She stated that, when she first observed Patrick, he did not have a complete range of motion of his legs. She observed Patrick with his parents upon only one occasion at which time he played with his mother while the father discussed the court order with the hospital staff. When asked what reaction the father had concerning the emergency court order placing the child in the custody of the welfare unit, she replied that the father was "upset." She testified that neither parent actively sought the treating doctor for further consultation about Patrick and that no explanation was ever offered by either parent concerning the child's condition. In the doctor's opinion, Patrick seemed to be afraid of men and would become upset if a man approached him.

During the time that Patrick was under the temporary managing conservatorship of the Child Welfare Unit, there were three successive caseworkers assigned to his case. The first caseworker conducted two visits with the Higgins and observed that Mr. Higgins related well with the other child, Bryan, but would have nothing to do with Patrick, and Patrick would have nothing to

do with his father. She further testified that the Higgins provided a clean and adequately-furnished home, were cooperative and expressed concern for Patrick's condition.

The second caseworker informed the Higgins that they needed counseling and that, although Mr. Higgins felt that such was unnecessary, both the father and mother attended three of five sessions at the Family Guidance Center. She testified that Patrick did not always get along with his father but did not show fear of him. She recalled that during one of her visits she noticed Patrick having a good time with both parents. She believed the parents were uncooperative, at least one of the parents had abused the child, and the parent-child relationship should be terminated. However, she could not testify that Patrick was in the possession of Mr. and Mrs. Higgins when he was injured.

In March 1974, Mr. and Mrs. Higgins moved to Houston and were unable to visit with Patrick because of transportation problems. The third caseworker saw Mr. and Mrs. Higgins in Houston. She informed the parents that they should attend the counseling sessions if they wanted Patrick returned to them. Although they attended the sessions, the counselor believed both parents were uncooperative and told them not to return until they wanted to get involved. She testified that Mr. Higgins told her that he had spanked the child with a chopping motion or with the flat of his hand when the child refused to walk. Although Mr. Higgins admits making this statement, he testified that he made it only after the caseworker told him that he would have to confess in order to receive help and to have his son returned.

Mr. Higgins testified that his normal way of disciplining both children was by first warning them and then by hitting them upon the behind with a belt. Mrs. Higgins testified that she sometimes spanked Patrick on the behind but that her husband was primarily responsible for the discipline of both children.

Mrs. Higgins testified that she obtained a job prior to the time that Patrick went into the hospital the first time and that while she was working the children were kept by Betty Sue Bowman, who was a neighbor across the apartment complex. Mrs. Higgins testified that Mrs. Bowman also had two children of her own and that she kept other children for different people. Mrs. Bowman was not called to testify.

Based upon this evidence the jury answered the following special issues which were based upon the requisites of Tex.Family Code Ann. § 15.02 (Vernon Supp.1976).

*Special Issue 1*

Do you find from the preponderance of the evidence that Hazel and Sammy Higgins had engaged in conduct which endangered the physical well-being of the child, Patrick Higgins?

Answer "We do" or "We do not."

Answer: We do not.

*Special Issue 2*

Do you find from the preponderance of the evidence that Hazel and Sammy Higgins have knowingly placed the child Patrick Higgins in conditions or surroundings which endangered the physical well-being of the said Patrick Higgins?

Answer "We do" or "We do not."

Answer: We do.

*Special Issue 3*

Do you find from the preponderance of the evidence that Hazel and Sammy Higgins have knowingly allowed the child Patrick Higgins to remain in conditions or surroundings which endangered the physical well-being of the said Patrick Higgins, if he was in them?

Answer "We do" or "We do not."

Answer: We do.

In regard to special issue number 4, you are instructed that if you have answered special issue numbers 1, 2 and 3, or any of them in the affirmative then answer the following special issue number 4; otherwise do not answer special issue number 4.

*Special Issue 4*

Do you find from the preponderance of the evidence that termination is in the best interest of the child Patrick Higgins? Answer "We do" or "We do not."

Answer: We do.

It is important to note that the jury found, in answer to special issue number 1, that Sammy and Hazel Higgins did not personally engage in conduct which endangered the physical well-being of the child. It is also important to note that no attack is made upon this finding. Therefore, the principal question remaining before us is whether the Dallas County Child Welfare Unit met its burden by establishing by a preponderance of the evidence that the Higgins *knowingly* placed or *knowingly* allowed Patrick to remain in conditions or surroundings which endangered his physical or emotional well-being.

Before addressing the question of insufficiency of the evidence, as contended by the Higgins, we deem it necessary to consider the applicable statute, Tex.Family Code Ann. § 15.02(1)(D) and (E) (Vernon Supp. 1976). This statute is entitled "Involuntary Termination of Parental Rights" and the relevant subsections of the statute are as follows:

A petition requesting termination of the parent-child relationship with respect to a *parent* who is not the petitioner may be granted if the court finds that:

(1) the *parent* has:

.     .     .     .     .

(D) *knowingly* placed or *knowingly* allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

(E) *engaged* in conduct or *knowingly placed* the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

.     .     .     .     .

and in addition, the court further finds that

(2) termination is in the best interests of the child. [Emphasis added.]

■ Although the legislature, when enacting the new Family Code, did not continue to use the terminology of the prior statutes by referring to a "neglected child" and "dependent child," we do not believe the legislature intended to repudiate the concept of child neglect. By reading the applicable provisions of the Family Code in light of this concept, we have come to the conclusion that subdivision (E) concerning engaging in conduct or knowingly placing the child with persons engaging in conduct was clearly intended by the legislature to be a provision concerning something more than neglect, namely aggressive behavior toward a child resulting in physical or emotional abuse.

■ On the other hand, the provision of the code, subdivision (D) concerning knowingly placing or knowingly allowing a child to remain in dangerous conditions or surroundings, shows the legislative intent to protect a child in the situation where a parent knowingly neglects it by exposing it to conditions or surroundings resulting in physical or emotional harm. We believe that this interpretation of the two subdivisions explains the rationale of the legislature in separating the two grounds for termination into two separate subsections. If the legislature had intended for both subsections to cover the same evil, there would be no logical reason for separating them into two distinct grounds. Therefore, we hold that subsection (D) is applicable where the child has been neglected while subsection (E) is applicable where the child is subjected to aggressive conduct by a person causing physical or emotional abuse.

■ The Higgins assert that the appellee-agency is required to prove its allegations under either subsections (D) or (E) by "a clear and convincing evidence standard" in order to terminate a parent-child relationship. The appellee-agency, on the other hand, contends that not only should the standard of proof be equal to a preponderance of the evidence but also that the doctrine of "res ipsa loquitur," applied in tort

law, should also be applied to the burden of proof in this type of case.[1]

### Sufficiency of Evidence

The application of *res ipsa loquitur* to child abuse and child neglect cases is a question of first impression in Texas. In some jurisdictions this doctrine has been adopted by statute.[2] Some courts have applied it without express statutory authority. *In re S*, 46 Misc.2d 161, 259 N.Y.S.2d 164, 165 (Fam.Ct.1965); *see also* Brown, *Medical and Legal Aspects of the Battered Child Syndrome*, 50 Chi-Kent L.Rev. 45, 70 (1973). Learned commentators have pointed out that in many such cases the only proof available is circumstantial evidence since abusive actions usually occur within the privacy of the home, the child is either intimidated or too young to testify, and the parents tend to protect each other. Fraser, *A Pragmatic Alternative to Current Legislative Approaches to Child Abuse*, 12 Amer. Crim.L.Rev. 103, 117 (1974), and 50 Chi-Kent L.Rev. 45, 70 (1973).

■ Without necessarily adopting the doctrine of *res ipsa loquitur* with all of its implications in the law of torts, we agree that circumstantial evidence may be sufficient to establish child abuse or child neglect within § 15.02. Accordingly, we hold that a fact finding that parents either abused a child or knowingly allowed it to remain in dangerous conditions may be supported by evidence of (1) multiple injuries or other serious impairment of health that ordinarily would not occur in the absence of abuse or gross neglect, and (2) the parents' control over the child during the period when the abuse or neglect is alleged to have occurred. Lack of any reasonable explanation by the parents of the child's condition is an additional circumstance that may be considered in support of such a finding.

The elements of proof above enumerated are not to be considered to be exclusive proof of other facts and circumstances to raise the issue of child abuse or neglect. *See generally* Paulsen, *The Legal Framework for Child Protection*, 66 Colum.L.Rev. 679, 697–703 (1966).

■ In the present case, we are not convinced that the evidence is factually sufficient to support the jury's findings. The proof is weak with respect to both injuries and the parents' control. The injuries found, if properly proved, together with the father's admission that he had disciplined the child by striking him on the legs, might have supported a finding that he had engaged in conduct which endangered the physical welfare of the child, but the jury refused to find that both he and the mother had engaged in such conduct. The findings that the parents knowingly placed the child in conditions or surroundings which endangered his well-being and that they knowingly allowed him to remain in such conditions or surroundings must rest on other evidence. Proof of the injuries themselves is somewhat unsatisfactory. No cuts or bruises were observed on the child's body. The attending physician testified that the child's knee was swollen and that she determined from the x-rays that he had suffered four fractures, but she was unable to say how or when the fractures had occurred. Only four days before admission to the hospital, the child had been discharged from the same hospital after ten days of observation and treatment, but no fractures were then detected. The record is not clear as to whether the injuries occurred in the four days intervening or as to who cared for the child in this period. Although the record suggests that both parents were working and that the child was left during part of

1. The doctrine of *res ipsa loquitur* is that a rebuttable presumption that the defendant was negligent arises upon proof that the instrumentality that caused the injury was in defendant's exclusive control, and that the accident was one which ordinarily does not occur in the absence of someone's negligence. *See generally* Prosser, The Law of Torts §§ 39–40 (4th ed.

1971); Restatement (Second) of Torts § 328D (1965).

2. N.Y.Jud.—Fam.Ct.Act § 1046(a)(ii) (McKinney 1975); Conn.Gen.Stat.Ann. § 17–38a(f)(4) (West 1973); and R.I.Gen.Laws § 40–11–7 (Bobbs-Merrill Supp.1975).

this period with a neighbor who kept other children and had two of her own, the neighbor was not called to testify concerning her knowledge of the child's condition. No evidence was offered tending to show that conditions in the neighbor's household endangered the child or that the parents knew of any unsafe situation there. We conclude, therefore, that the evidence is factually insufficient to support the findings that the parents knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered his physical well-being. This decision should not be interpreted as a holding that the evidence is legally insufficient to raise a jury question. Neither should it be taken as establishing the quantum of proof required in a case involving conservatorship rather than termination of the parent-child relationship.

### Standard of Proof

■ We cannot agree with the Higgins's contention that the burden was upon the agency to establish its allegations by "clear and convincing evidence" rather than by a "preponderance of the evidence." The legislature has expressly provided in Tex.Family Code Ann. § 11.15 (Vernon 1975) that proof of the facts by a preponderance of the evidence is a sufficient standard in cases for parent-child relationships terminations. Consequently, the agency should only be required to adhere to that standard. *Ervin v. Wichita County Family Court Services,* 533 S.W.2d 947, 950 (Tex.Civ.App.—Fort Worth 1976, no writ). *See also Magallon v. State,* 523 S.W.2d 477, 479 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ).

Since the case must be reversed because of the insufficiency of the evidence and the cause remanded to trial again, we take note of two contentions advanced by appellant.

### Special Issues Submission

■ The Higgins complained of the method of submission of special issue numbers 2, 3 and 4 in that, as the issues were framed, the husband and wife were improperly joined together. They argue that the court should have submitted the issues, if at all, in such a manner as to inquire about acts and conduct of each parent separately. Although the Higgins failed to object to the court's charge concerning the method of submission as required by Tex.R.Civ.P. 273, we address this argument in view of our remand of the case for another trial. We hold that each parent should have his or her rights submitted separately to the jury in a termination proceeding. Tex.Family Code Ann. § 15.02 (Vernon Supp.1976), when referring to the child's parents, consistently states "parent" with one exception and in another subsection not relevant to this opinion. Tex.Family Code Ann. § 15.05 (Vernon 1975) also addresses the situation where the court terminates the parent-child relationship with respect to *both parents* or to the only living parent and gives the court guidance as to further action. If the legislature had meant for both parents to stand or fall together in a termination proceeding it would have so stated. However, in § 15.02, the legislature consistently referred to parent as a singular noun, and the legislative intent can only be interpreted to mean that each parent should be allowed to defend his or her own case and to ask the jury through a separate special issue about his or her parent-child relationship. Also, we hold that a separate submission of the special issue concerning each parent is required because we believe that the best interest of the child is not achieved when special issues are submitted to the jury in such a manner as to require it to refuse to terminate the parent-child relationship of both parents when it is convinced that one parent has abused or neglected the child and only that parent's rights should be terminated. Moreover, we note that the jury in the case at bar answered special issue number one negatively, and it is impossible to determine if the jury answered the issue in such a manner because its joint submission concerning both parents restricted the jury to this finding even though it might have be-

lieved that one parent had actually engaged in the alleged conduct.

■ Probably, in most cases, only one of the parents has been actively abusive. If the evidence, circumstantial or otherwise, is sufficient, the issues should be submitted so that the jury may find that one parent has engaged in conduct that endangered the physical well-being of the child, and that the other parent has knowingly allowed the child to remain in conditions that endangered its well-being. Here, the jury had no opportunity to make such a finding, although there was some evidence that one of the parents had been actively abusive.

### Admissibility of X-Rays

■ Also, the Higgins argue that the trial court erred in admitting the x-rays allegedly made of the child, Patrick, as well as all related portions of the treating doctor's testimony based on such x-rays over their timely objection. In order to lay the predicate for the admission of the x-rays into evidence the agency presented a witness who was a radiological technician not employed at Parkland at the time the x-rays were taken and who did not actually know the technician that took the x-rays. This witness testified that he could identify the x-rays as being those of Patrick by "photo-flash." However, there was no explanation in the record as to what is meant by this term. Neither did the agency comply with Tex.Rev.Civ.Stat.Ann. art. 3737e, §§ 6 and 8 (Vernon Supp.1976) concerning the introduction of hospital x-rays into evidence. Consequently, the x-rays were improperly admitted and cannot be considered as evidence of probative force. *Travelers Insurance Co. v. Williams,* 355 S.W.2d 728 (Tex.Civ.App.—Beaumont 1962, writ ref'd n.r.e.); *Hartman v. Maryland Casualty Co.,* 417 S.W.2d 640, 652 (Tex.Civ.App.—Waco 1967, no writ); *Community Chapel Funeral Home v. Allen,* 499 S.W.2d 215, 216 (Tex. Civ.App.—Beaumont 1973, writ ref'd n.r.e.); *see also* Brown, *Medical and Legal Aspects of the Battered Child Syndrome,* 50 Chi-Kent L.Rev. 45, 74 (1973). Upon another trial, if these x-rays are offered, they should be presented in accordance with the established rules.

The judgment of the trial court is reversed and the cause is remanded to the juvenile court for further proceedings. This order does not affect the temporary managing conservatorship of the Dallas County Welfare Unit.

Reversed and remanded.