## In the Interest of J.M.C.A., V.C.R., M.R., and R.R., Jr.

### No. 01–99–00208–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 12, 2000.

Alvin Saenz, Houston, Sheelah M. Wooten, Lake Jackson, Thomas "Jay" Wooten, Friendswood, Johnette Duff, Galveston, for Appellant.

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

Michael J. Guarino, B. Warren Goodson, Jr., Galveston, for Appellee.

Panel consists of Justices O'CONNOR, HEDGES, and PRICE.*

## OPINION

MICHOL O'CONNOR, Justice.

The appellants, R.R. ("Father") and K.R. ("Mother"), appeal from an order terminating their parent-child relationships. We affirm.

### Background

The Texas Department of Protective and Regulatory Services ("DPRS"), the appellee, filed several petitions to terminate the parent-child relationship between the Mother and her four children, J.M.C.A. (four years old), V.C.R. (three years old), M.R. (two years old), and R.R. (one year old), and between the Father and his three children V.C.R., M.R., and R.R. The DPRS also sought to terminate the parent-child relationship between J.M.C.A.'s father and J.M.C.A.[1]

The jury was asked broad-form questions as to both of the parents, separately, for each of the children: "Should the parent-child relationship between [parent 1] and [child 1] be terminated?" The jury answered, "Yes" to each question. The jury charge tracked Family Code section 161.001(1) in alleging the Mother and Father:

1. knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; or

2. engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; or

1. J.M.C.A.'s father participated in the underlying proceeding, but he did not appeal the decree of termination.

3. failed to support the children in accordance with his/her ability during a period of one (1) year ending within six (6) months of the date of the filing of this petition; or

4. constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services or an authorized agency for not less than six (6) months, and:

   (i) the department or authorized agency has made reasonable efforts to return the children to the parent;

   (ii) the parent has not regularly visited or maintained significant contact with the children; and

   (iii) the parent has demonstrated an inability to provide the children with a safe environment; or

5. failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of children who have been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the child.

The jury was also required to find that termination of the parent-child relationships be in the children's best interest.

### Summary of Facts

On November 23, 1997, the Mother saw the Father sitting on J.M.C.A.'s bed with his pants down to his knees. J.M.C.A. was on the bed and wearing a shirt, but no underwear or pants. The Mother became upset and left the house. She did not take J.M.C.A. with her. After talking with a neighbor, the Mother went back to her house with the neighbor. The neighbor testified that J.M.C.A. was crying and upset, and said the Father "did something to her."

Several witnesses also testified that the Mother said she found the Father and J.M.C.A. in the bedroom, the Father had his pants down, J.M.C.A. did not have any clothes on, and there was Vaseline smeared on her genital area. J.M.C.A. told these witnesses the Father put the Vaseline on her, and put his "pee-pee" in her. The Mother called the police, and the Father was arrested for the sexual assault of J.M.C.A. and indecency with V.C.R.

The Mother took J.M.C.A. to the hospital immediately after the incident, where the treating physician determined that the examination results were "consistent with the types of acts described" by the Mother, and suggested that the Mother take J.M.C.A. to an abuse clinic for a more detailed exam. The next day, the Mother took J.M.C.A. to the ABC Clinic, where an expert determined that the child had been sexually abused.

The Mother left the Father's house after his arrest, and took the children to stay with her cousin. The cousin testified the Mother questioned J.M.C.A. several times about what happened. The cousin said the Mother did not want to believe J.M.C.A. and, as punishment, threatened to take J.M.C.A. back to the Father's house.

Mary Ramirez, the Child Protective Services (C.P.S.) sexual abuse investigator, said the Mother told her of another incident in which she found a "grease stain" in J.M.C.A.'s underwear, and J.M.C.A. had told the Mother that the Father "had done something to her back then." The Mother did not report that incident.

Ramirez told the Mother there was to be no contact between the Father and any of the children during the investigation. On December 4, 1997, however, the Mother returned with the children to live with the Father after he was released on bond. On December 5, Ramirez went to the home because C.P.S. had received a call that the Mother and children had returned to the

Father the night before. When Ramirez questioned the Mother about why she had returned, the Mother said she wanted all the charges against the Father dropped, they belonged together as a family,· and she did not intend to leave. C.P.S. took the children into emergency custody.

Cathy Lynskey, the foster mother who took the children into her home, testified that J.M.C.A. said the Mother told her to say nothing happened to her.

## Sufficiency of the Evidence

### Standard of Review

■ Family Code section 161.001(1) lists 14 separate possible grounds for termination, using the disjunctive phrase "or." Subsection (2) adds "and ... that termination is in the best interest of the child." TEX.FAM.CODE § 161.001(1), (2). Thus, the statute allows for termination of parental rights upon a finding that the parent engaged in conduct described in any one of the 14 sub-parts under section 161.001(1), plus a finding that termination is in the best interest of the child as required by section 161.001(2).

■ The termination of parental rights involves fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). Evidence supporting the findings to terminate parental rights must be clear and convincing, not just preponderate. TEX.FAM.CODE § 161.001; *In re G.M.*, 596 S.W.2d 846, 847 (Tex.1980); *Harris v. Herbers*, 838 S.W.2d 938, 941 (Tex.App.—Houston [1st Dist.] 1992, no writ). The clear and convincing standard of proof is intentionally placed on the party seeking the termination of the parental rights, so as to create a higher burden to fulfill, because of the severity and permanence of the termination of the parent-child relationship. *In re J.N.R.*, 982 S.W.2d 137, 141 (Tex.App.—Houston [1st Dist.] 1998, no pet.). The clear and convincing standard requires more proof than the preponderance of the evidence standard in civil cases, but less than the reasonable doubt standard in criminal cases. *G.M.*, 596 S.W.2d at 847; *J.N.R.*, 982 S.W.2d at 141. The clear and convincing standard is the degree of proof that will produce in the mind of the trier of fact a "firm belief or conviction" as to the truth of the allegations sought to be proved. *G.M.*, 596 S.W.2d at 847; *J.N.R.*, 982 S.W.2d at 141.

■ On appeal, in evaluating the sufficiency of the evidence supporting a trial court's decision to terminate parental rights, the standard of review is not affected by the heightened burden of proof required in the trial court. *J.N.R.*, 982 S.W.2d at 142. In conducting a legal sufficiency review, we consider only the evidence and inferences tending to support the fact finding, and we disregard all contrary evidence and inferences. *See Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). If any evidence of probative force supports the finding, we will uphold the decision. *Id.* In conducting a factual sufficiency review, we view all of the evidence; we will sustain a factual sufficiency challenge only if, after viewing all the evidence, we conclude the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996); *Hollander v. Capon*, 853 S.W.2d 723, 726 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

### The Mother's Appeal

■ In the Mother's point of error two, she asserts the evidence was insufficient to support the jury's verdict. The Mother does not phrase her complaint as a challenge to either the legal or factual sufficiency of the evidence; instead, she contends the DPRS did not meet its burden of showing by clear and convincing proof that her parental rights should be terminated.

The Mother relies on *Higgins v. Dallas County Child Welfare Unit*, 544 S.W.2d 745 (Tex.App.—Dallas 1976, no writ), for the proposition that involuntary termi-

nation requires evidence of each parent's "aggressive behavior towards the child." *Id.* at 749. The Mother asserts there is no evidence she actively harmed any of the children.

The *Higgins* court analyzed Sections D and E of the predecessor provision of Section 161.002, which is substantially the same as the present subsections D [2] and E.[3] The Dallas Court of Appeals held the Legislature intended Section E to be a provision "concerning something more than neglect, namely aggressive behavior toward a child resulting in physical or emotional abuse." *Id.*

In a later case, the Dallas Court of Appeals overruled *Higgins* "to the extent that it construes subsection (E) as requiring aggressive *or* abusive behavior directed towards the child." *In re S.H.A.,* 728 S.W.2d 73, 83–85 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). The Court overruled *Higgins* for the following reasons:

First, *Higgins* interpretation violates the plain language of the statute.... Th[e] provision does not require "aggressive behavior," nor does it require that the conduct be directed towards the child.

... Second, ... termination may be based on emotional endangerment only.... *Higgins* does not account for the possibility of the parent engaging in "conduct" which endangers only the emotional well-being of the child and, although not physically abusive behavior directed towards the child, nevertheless warrants termination of parental rights.

... Third, the *Higgins* case draws a neglect-abuse distinction ... The statute does not, however, use the terms "neglect" and "abuse" .... [T]he cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's acts but also by the parent's omissions or failures to act.

... Finally, since *Higgins,* other courts of appeals have addressed situations where the parent's "conduct" was neither knowingly subjecting the child to a harmful physical environment under subsection (D), nor physically abusing the child, as *Higgins* defined subsection (E); these types of "conduct," however, were held to endanger the physical or emotional well-being of the child, and thus warranted termination.

*S.H.A.,* 728 S.W.2d at 83–85.

■ Therefore, *Higgins* does not assist the Mother's cause. The Dallas Court of Appeals now holds that evidence of the parent's omissions or failure to act may be considered by the jury in determining whether to terminate parental rights. *S.H.A.,* 728 S.W.2d at 85. We agree with the reasoning of *S.H.A.*

In *Lakes v. Texas Dep't of Human Servs.,* 791 S.W.2d 214 (Tex.App.—Texarkana 1990, no writ), the Texarkana Court of Appeals held there was clear and convincing evidence that a parent had endangered the children's physical and emotional well-being when the mother knew:

that her daughter's hymen was enlarged, and that she had suffered irritation in her vaginal area; she was told by her daughter that [Robinson] had put his finger in her vagina; she had been told by a Department of Human Services caseworker that her daughter had said that [Robinson] had sexually molested her; and she was aware that Robinson had confessed such activity to the police. She was also aware that Department of Human Service workers had determined that her children displayed behavior consistent with child abuse.

---

**2.** "(D) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children...." TEX. FAM CODE § 161.001(D).

**3.** "(E) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children...." TEX.FAM CODE § 161.001(E).

Knowingly placing or leaving the children with persons known to have sexually abused them is sufficient evidence to justify termination.

*Id.* at 216.

In the present case, the Mother saw the Father engaging in inappropriate and abusive behavior with J.M.C.A.; she was told by J.M.C.A. the Father put Vaseline on her, and he put his "pee-pee" in her; she was told by a C.P.S. caseworker that J.M.C.A. said the Father sexually abused her; and she was aware that the treating physician made an assessment that J.M.C.A. had been sexually molested. Based on these facts, the jury could have reasonably found clear and convincing evidence the Mother had endangered her children's physical and emotional well-being by continuing to live with the Father.

The Fort Worth Court of Appeals has even upheld a jury verdict terminating parental rights when the medical evidence did not definitively show abuse stating,

> The medical evidence did not conclusively show [the child] had been abused, nor did it indicate [the child] had not been abused. Therefore, the medical evidence did not contradict testimony that [the child] had been abused, and appellant did not introduce any evidence to contradict this testimony.

*In re L.R.M.*, 763 S.W.2d 64, 68 (Tex. App.—Fort Worth 1989, no writ). The court concluded the jury could have reasonably found that the mother's boyfriend sexually abused the child, and that the mother knowingly placed the children with the boyfriend, thereby endangering their physical and emotional well-being. *Id.*

Here, the physician's assistant who treated J.M.C.A. assessed the sexual assault of the child and felt very strongly that there were no physical findings because a lubricant was used. The jury could have reasonably concluded (1) the Father did in fact abuse J.M.C.A., because no evidence was admitted to contradict the testimony that the child had been abused,

and (2) by continuing to live with the Father, the Mother endangered J.M.C.A. as well as the other children. *See L.R.M.*, 763 S.W.2d at 68.

The Fort Worth Court of Appeals has also held that the "fact that [the mother] allowed the children to remain unattended in the company of one she knew had abused the children in the past provides a basis for termination under section (E)." *In re A.C.*, 758 S.W.2d 390, 393 (Tex. App.—Fort Worth 1988, no writ).

Substantial evidence indicates the Father abused J.M.C.A., and the Mother was aware of the abuse. In spite of all this, the Mother continued to live with the Father. The jury properly concluded that such conduct poses a danger to her children.

Finally, the Waco Court of Appeals has held that a parent's abusive conduct directed toward one child will suffice to support the termination as to other children. *Lucas v. Texas Dep't of Protective & Regulatory Servs.*, 949 S.W.2d 500, 503 (Tex. App.—Waco 1997, writ denied). An expert testified in *Lucas* that the father's behavior fit the classic diagnosis of pedophilia. *Lucas* held that the father's abuse showed a course of conduct that had the effect of endangering the physical or emotional well-being of his other children. *Id.*

In this case, a child clinical psychologist testified she saw a significant risk of continued abuse and inappropriate behavior by the Father, and "felt that because of many similarities between [the Father's] test data and those of other individuals who engage in abusive behavior that a sex offender treatment program would be very appropriate." The Mother has refused to leave the Father and intends to live with him. While M.R. and R.R. did not make an outcry, the jury properly found, based on the evidence presented, that continuing to live with the Father posed a danger to them, as well as J.M.C.A. and V.C.R..

We hold the evidence is legally and factually sufficient to support the jury's ver-

dict that the Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being.

We overrule the Mother's point of error two.

**The Father's Appeal**

In the Father's point of error two, he asserts the evidence is insufficient to support the jury's verdict.

■ The Father's entire argument under this point consists of a lengthy legal discussion asserting that termination was not justified when the evidence shows a parent's failure to provide a desirable degree of care and support of the child is due to lack of intelligence, training, or misfortune. The Father does not contend, however, his lack of intelligence, training, or misfortune led him to sexually molest his children. Nor does the Father point to any evidence in the record that would support such a contention.

■ A party asserting error on appeal bears the burden of showing that the record supports the contention raised, and of specifying the place in the record where matters upon which he relies or of which he complains are shown. *Happy Harbor Methodist Home, Inc. v. Cowins*, 903 S.W.2d 884, 886–87 (Tex.App.—Houston [1st Dist.] 1995, no writ); TEX.R.APP.P. 38.1(h). When this burden is not carried, the party waives the point of error. *Happy Harbor*, 903 S.W.2d at 886–87. We will not do the job of the advocate. The Father provides no support for his contention that his lack of intelligence, training, or misfortune led him to sexually molest his children. The Father's insufficiently briefed point is waived. Therefore, we overrule the Father's point of error two.

**Jury Charge**

■ In the Father and Mother's points of error one, both assert the issue submitted to the jury regarding termination was incorrect because it did not allow for two separate findings required under Family Code section 161.001. The Father and Mother contend the jury question was incorrect because the jury should have been asked whether either parent engaged in any of the conduct prohibited under Section 161.001 and whether termination was in the best interest of each child.

The jury was asked broad-form questions as to both of the parents, separately, for each of the children: "Should the parent-child relationship between [parent 1] and [child 1] be terminated?" The jury answered, "Yes" to each question. Neither the Father nor the Mother objected to the question during the jury charge conference.

The Supreme Court considered and rejected the same argument made by the Father and Mother in *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647 (Tex. 1990). In *E.B.*, the Texas Department of Human Services sued for termination of the parent-child relationship between E.B. and her two children. The suit was based on alleged violations of the Texas Family Code and on the ground that the termination would be in the best interest of the children. The trial court submitted a single question for each child under the applicable Family Code sections, as a broad-form submission. One question read, "Should the parent-child relationship between [Respondent E.B.] and the child [E.B.] be terminated?" The jury was asked to answer "yes" or "no." The second question was the same except for the child's initials. The Supreme Court approved the question and stated that the charge in parental rights cases should be governed by the same broad-form mandate as other civil cases. *Id.* at 649.

We overrule the Father and Mother's points of error one.

We affirm the trial court's judgment.