**Opinion issued December 18, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-25-00461-CV

_____

## IN THE INTEREST OF M.M.H.H., A CHILD

---

**On Appeal from the 313rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-00937J**

---

## MEMORANDUM OPINION

This accelerated appeal arises from a suit brought by the Texas Department of Family and Protective Services (DFPS) to terminate a parent-child relationship. After a jury trial, the trial court terminated the parental rights of J.B.H. aka J.B. a/k/a

J.S. (Mother) to her minor child, "Molly,"[1] consistent with the jury's findings that Mother engaged in the endangerment grounds for termination and failed to comply with the court-ordered family service plan requirements,[2] and its finding that termination of the parent-child relationship was in Molly's best interest.

Mother challenges the trial court's ruling in five issues, contending that the trial court erred in denying her request to reopen the evidence for her witnesses' testimony; the evidence is legally and factually insufficient to support the jury's findings supporting termination of Mother's parental rights; and the trial court erred in appointing DFPS as Molly's sole managing conservator.

We affirm.

## Background

Over two consecutive days in January 2024, Molly, then eleven years old, disclosed several times at her middle school that her stepfather touched her on her private parts and had been touching her inappropriately for years. Molly stated that she had told Mother about it, but Mother got angry with Molly and told Molly she was lying. Molly also disclosed that her brother would "hump" her over her clothes.

---

[1]     We use aliases for the child and Mother to protect the child's identity . *See* TEX. R. APP. P. 9.8(b)(2).

[2]     *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O).

2

After her disclosures, Molly was taken to the Seabrook Police Station. DFPS Investigator Alicia Balfour went to investigate. Law enforcement had taken Molly to the police station, so Balfour met with her there. Molly stated that her stepfather touched her on her private part and that her brother would hump her over her clothes. Molly told Balfour that Mother did not believe her and accused her of lying.

Balfour next spoke with Mother and the stepfather at the police station. The stepfather denied the allegations. Mother told Balfour that Molly was lying and was disabled.[3]

Mother agreed to take Molly to stay with a family friend, away from the brother and stepfather, until DFPS could conduct a forensic interview with Molly to get more information. Mother refused to let Balfour interview the other members of the household before Mother spoke with her attorney. Mother told Balfour she would provide the attorney contact information the next day but never did so.

Mother then left for the Washington, D.C. area to get surgery on her finger. She did not provide any contact information for her or for Molly. Balfour eventually located Mother in Maryland with Molly and tried to arrange for Molly's forensic interview with Maryland Child Protective Services, but Mother refused to cooperate

---

[3] The jury heard testimony from a medical geneticist that Molly had a genetic disorder that put her at risk for developmental delay. In cases he had seen before with a similar genetic disorder, children typically had borderline intellectual disability. Molly seemed a little bit delayed from what he would expect for a child her age, but not significantly.

and did not return any of Balfour's phone calls. Mother and Molly stayed with Molly's grandmother in Maryland from January until about April 2024. Balfour had Maryland law enforcement try to conduct a welfare check on Molly at the grandmother's home, but no one would answer the door.

When Mother and Molly returned to Texas, they went back into the home with the stepfather and brother. Mother did not notify DFPS when she and Molly returned to Texas; Balfour learned they had returned from Molly's grandmother. Mother still refused to allow the forensic interview to proceed or otherwise cooperate with the Department.

The Department concluded that Molly was not safe at home and filed for custody. Balfour found Molly credible, and the various reports she received about Molly's disclosures at school were factually consistent. When Balfour hears that a parent doesn't believe a child who's made an outcry of sexual abuse, she understands that the parent will not protect the child.

Seabrook Police Department Detective Alberto Alarcon testified about his efforts in locating Molly and Mother after they left Texas in January. He spoke with the stepfather, who said that Molly and Mother were in the Washington, D.C. area. When he reached Mother on the phone, Mother told him that she would return to Texas but would not be bringing Molly. Alarcon described Mother as uncooperative. The telephone call involved "a lot of screaming," and Mother and Alarcon "pretty

4

much just yelled at each other the entire time." Mother complained that the middle school Molly attended had problems with drugs and sexual things. She told Alarcon that Molly's friends "made the story up" and Molly went along with it. According to Alarcon, the police department had no prior indication of any criminal activity or sexual abuse activity happening at the school.

As for Molly's allegations of sexual abuse by the stepfather and brother, Mother told Alarcon that Molly was autistic and asked him how he could believe someone who is autistic.[4] Mother didn't think Molly was capable of telling the truth because of her disability and remarked that it was ridiculous for the school and law enforcement to take the word of a disabled child.

The stepfather was arrested for some traffic violations, which gave Alarcon the opportunity to interview him. The stepfather seemed cooperative. Yet Mother had remarked to Alarcon that if the stepfather ever talked to law enforcement or provided information, there would be some repercussion.

The stepfather described his relationship with Molly as "very close." Molly would ride in the car with the stepfather while he worked for DoorDash, and she would go into the restaurants to pick up orders for him.

---

[4] The medical geneticist stated that Molly did not have any of the typical behaviors observed in a patient with autism.

The stepfather denied touching Molly inappropriately. He told Alarcon that Molly made the story up so she could go to the Washington, D.C. area with Mother. The Seabrook Police Department eventually referred a case to the District Attorney to determine whether charges should be brought against the stepfather for indecency with a child.

On April 9, 2024, another officer reported a terroristic threat made by Mother. Mother was charged with interference with public duties because of her lack of cooperation in Molly's DFPS case. The Seabrook Police Department referred the case against Mother to the District Attorney's Office in January 2025.

Arianne Valdez, a forensic evaluation clinician with the Children's Assessment Center, interviewed Molly over five sessions. Molly disclosed that the stepfather had been digitally penetrating her vagina, and she disclosed anal penetration by a brother close to her age. Molly also told Valdez that Mother was constantly yelling at her and cussing her out, which made Molly feel sad. Molly said that after DFPS got involved, Mother bought them tickets to go to D.C. so they could hide from DFPS.

Molly also talked to Valdez about neglect in the home. She stated that the family would eat take-out food every day and would leave the food and trash everywhere. Roaches and mice infested the home. Molly also said that there was no

hot water at home, so they would go to the YMCA to bathe. At night, Molly slept with her Mother and the stepfather in their bed.

Valdez concluded that Molly made a credible disclosure of abuse. Molly could identify the difference between a truth and lie, and she promised to tell the truth. Also, Molly's disclosure to Valdez was consistent with those Molly previously made to a DFPS worker and to the counselors at Molly's school. And nothing Molly said gave any indication that someone else was influencing her.

Autumn Grayson, DFPS conservatorship worker, testified about Mother's compliance with her family service plan. Mother told Grayson that she "did not trust" DFPS providers and chose her own service provider for the psychological evaluation, but Grayson did not receive proof that Mother completed the evaluation until a few months later. The evaluation was also missing information; it stated that Mother was on medication but did not identify the medication. The evaluation also contained recommendations for follow-up, including regular medication reviews. But there was no sign that Mother had complied with those recommendations. Nor did Mother complete the psychiatric assessment required by her family service plan.

Mother didn't allow Grayson inside the family's home, so Grayson could not do a home assessment. Mother could have provided photos of the home, but she didn't do that either.

7

Grayson also testified about Molly's progress in DFPS custody. When Molly first came into care, she was hesitant and had difficulty expressing her wants and needs, such as whether she wanted to speak to family members. Molly looked like "a typical 12-year-old girl," but mentally she seemed around the age of nine.

Molly's therapist, Denise Bradley, corroborated Molly's progress. When Molly began individual counseling, she was "very shy, very closed off." Over time, Molly opened up and began talking about more things. She talked about things she enjoyed.

Molly talked about missing her dog. But Molly never said that she missed Mother or the stepfather or her brothers. Molly talked about her parents fighting. She told Bradley that she doesn't think about her parents and doesn't want to see them. Molly said that she was sick of people asking her about her family or telling her to talk to her brothers or asking her what she thought about her family. Molly stated that she did not want to return to the family home and wanted to continue living in her current fictive kin placement "forever."

Bradley stated that Molly described her stepfather as "tall and creepy." Molly mentioned during some of the therapy sessions that the stepfather sexually abused her, that he touched her inappropriately. But Molly did not want to talk about it in detail other than to tell Bradley that the stepfather would touch her and that it happened at night. Bradley understood that Molly was "terrified about whatever

8

happened at home" and feared that the stepfather and brother would sexually abuse her if she were returned.

Jasmine Moreno, who has been Molly's "primary teacher" since Molly has been in care, testified that she works with students who have intellectual disabilities. She stated that Molly's social skills were near her grade level but Molly had challenges in academics; her reading and math comprehension was at about a second-grade level. Molly was an enthusiastic learner and was trying out for the school choir.

Molly's caregiver in her fictive kin placement testified that since Molly came into the caregiver's home, she had made tremendous progress. She has learned to wake up for school, dress herself, and make some decisions on her own. The caregiver described Molly as "a thriving young girl that is plenty capable of taking care of herself on down the road" and noted that Molly just needed "somebody to help her get there." And the caregiver wanted to be the person to help Molly. The caregiver wanted to adopt Molly and believed that it would be in Molly's best interest to remain in her home. She expressed her wish to adopt Molly.

Mother told the jury that the way Molly's developmental disability affected her was that Molly told "stories" and mimicked "whatever other people are going through." Mother did not think Molly fully understood the difference between the truth and a lie. And Molly likes to get attention. Mother does not believe the sexual

assaults that Molly alleged actually happened. Mother also denied that her house was dirty, was a "hoarder house" or that there was any insect or vermin infestation.

Jennifer Saucer, Molly's guardian ad litem, testified that Molly expressed her wish to stay in the fictive kin placement. Saucer did not believe that Mother could meet Molly's emotional or physical needs. Saucer opined that Mother "lacke[d] protective capacity" and recommended termination of Mothers parental rights.

## Exclusion of Evidence

In her first issue, Mother asserts that the trial court erred in excluding two of her witnesses. This issue misstates the procedural stance of her complaint. The record shows that the trial court did not exclude any witnesses during Mother's case in chief. After she rested, Mother asked to reopen her case in chief so she could present testimony from two witnesses who were not available earlier. The trial court refused to do so.

Texas Rule of Civil Procedure 270 provides:

When it clearly appears to be necessary to the due administration of justice, the court may permit additional evidence to be offered at any time; provided that in a jury case no evidence on a controversial matter shall be received after the verdict of the jury.

TEX. R. CIV. P. 270. In deciding whether to permit additional evidence, a court should consider whether: (1) the moving party showed due diligence in obtaining evidence; (2) the proffered evidence is decisive; (3) the reception of such evidence will cause undue delay; and (4) granting the motion to reopen evidence will cause

10

injustice. *In re C.K.H.*, No. 01-22-00603-CV, 2023 WL 2026550, at *7 (Tex. App.—Houston [1st Dist.] Feb. 15, 2023, pet. denied) (mem. op.); *Poag v. Flories*, 317 S.W.3d 820, 828 (Tex. App.–Fort Worth 2010, pet. denied). We review the trial court's ruling for an abuse of discretion. *See In re C.K.H.*, 2023 WL 2026550, at *7.

Mother, like other appellants, must comply with the preservation-of-error requirements to be entitled to review of the issues she raises on appeal. *See In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) ("[T]he rules governing error preservation must be followed in cases involving termination of parental rights, as in other cases in which a complaint is based on constitutional error."); *see also In re B.L.D.*, 113 S.W.3d 340, 350–51 (Tex. 2003) (fundamental-error doctrine does not apply to procedural preservation rules, nor does due process require appellate review of unpreserved complaints in parental rights termination cases). Through counsel, Mother informed the trial court that her witnesses had become available, but she did not say what the substance of the witnesses testimony would be or provide any other information for the trial court to consider under the four factors. Mother, as movant, had the burden to show that re-opening evidence to allow her witnesses to testify was "necessary to the due administration of justice." *See* TEX. R. CIV. P. 270; *see Kardell v. Union Bankers Ins. Co.*, No. 05-01-00662-CV, 2002 WL 1809867, at *8 (Tex. App.—Dallas Aug. 8, 2002, no pet.) (mem. op.). Without such a showing, we cannot say that the trial court abused its discretion in denying Mother's request.

11

Mother also argues that she preserved a due process complaint to the trial court's refusal to reopen evidence for her witnesses because she complained to the trial court, "[T]his is an unfair trial. It's unfair and against the law, and it violated the law." But because Mother is not entitled to hybrid representation, the trial court was not required to rule on her pro se complaint. *See In re H.O.*, 555 S.W.3d 245, 247 n.1 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

We overrule Mother's first issue.

## Sufficiency of the Evidence

In her second, third, and fourth issues, Mother asserts that the evidence is legally and factually insufficient to support the jury's findings that she engaged in the predicate acts set forth in Family Code sections 161.001(b)(1)(D), (E), and (O) and that termination of her parental rights was in Molly's best interest. *See id.* § 161.001(b)(1)(D), (E), (O), (b)(2).

### A. Standard of Review

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Id.* at 759 (internal quotations omitted). Thus, we strictly scrutinize termination proceedings and strictly construe

12

involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

At the same time, we remain mindful that "the rights of natural parents are not absolute." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Only "those fit to accept the accompanying responsibilities" are entitled to assume them. *Id.* Recognizing that a parent may forfeit his parental rights based on his actions or omissions—the primary focus of a termination suit is protection of the child's best interests. *Id.*

Thus, in reviewing a challenge to the legal sufficiency of the evidence supporting the trial court's termination of parental rights, we "determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (internal quotations omitted). "[W]e look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotations omitted). Yet we may not "disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted). In conducting a factual-sufficiency review in this context, we inquire "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [ ] allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a

reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

**B. Applicable Law**

Section 161.001(b) of the Family Code authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b)(1)(A)–(U), (b)(2). Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d at 702 (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)).

Although only one predicate ground is necessary to support a judgment of termination, we may not bypass challenges to the sufficiency of the evidence to support findings under subsections 161.001(b)(1)(D) and (E)—"the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of his rights to another child." *Id.*; *see* TEX. FAM. CODE § 161.001(b)(1)(M).

In her motion for new trial, Mother asserted that there was no evidence that she knowingly placed or knowingly allowed her child to remain in conditions or surroundings which endangered her child's physical or emotional well-being or that she endangered her child by engaging in conduct or knowingly placing her child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. Mother also contended that the evidence was legally and factually insufficient to support the jury's finding that termination of the parent-child relationship is in Molly's best interest. We consider these challenges below.

## C. Endangerment Findings

### 1. Section 161.001(b)(1)(D)

Family Code section 161.001(b)(1)(D) authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence the parent "knowingly placed or knowingly allowed the child to remain in conditions

or surroundings which endanger the physical or emotional wellbeing of the child." TEX. FAM. CODE § 161.001(b)(1)(D).

To establish subsection (D), DFPS must prove that the parent's conduct caused a child to be placed or remain in an "endangering environment." *In re J.W.*, 645 S.W.3d at 749; *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The suitability of the child's living conditions and the conduct of parents or others in the home are relevant to this inquiry. *In re J.W.*, 645 S.W.3d at 749.

## 2. Section 161.001(b)(1)(E)

Family Code section 161.001(b)(1)(E) authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(E).

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is endangered if her environment creates a potential for danger that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018,

pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

The evidence shows that Molly told her therapist, and Mother confirmed, that Molly slept in the same bed with Mother and the stepfather when she was living in the family home. When Mother was told of Molly's disclosure of sexual abuse by the stepfather and brother, she agreed to stay with Molly at a friend's home, away from the stepfather and brother. After one night, though, she left with Molly for the Washington, D.C. area.

In addition to removing Molly from the jurisdiction, Mother interfered in other ways with the authorities' investigation into Molly's disclosure of sexual abuse by the stepfather and brother. Mother insisted that Molly was lying, blaming Molly's purported inability to tell the truth on her disability and her eagerness to get attention. Mother claimed that Molly fabricated the story after exposure to inappropriate social media content and school activities. In contrast, both Valdez and Grayson, who have expertise and experience in assessing the credibility of child victims, testified that they found Molly's allegations of sexual abuse to be credible.

Mother also prevented the authorities from speaking with her sons, threatened the stepfather about discussing the alleged abuse with the authorities, and removed Molly from the jurisdiction for months. DFPS took Molly into custody because when

17

she and Mother returned to Texas, Mother brought Molly back to the family home where the abuse occurred, and they were living with Molly's stepfather and her siblings, including the brother Molly stated had sexually abused her.

While the case was pending, Mother refused to allow DFPS to inspect the family home and did not propose any alternative to having Molly live with the stepfather and brothers. And even in her trial testimony, she never wavered from her opinion that Molly was lying and no abuse had occurred.

Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is a part of the conditions or surroundings of the child's home under section 161.001(1)(D). *In re B.R.*, No. 1-13-00023-CV, 2013 WL 3243391, at (Tex. App.—Houston [1st Dist.] June 25 2013, no pet.) (mem. op.). And placement with an abusive parent or relative is endangerment under either subsection (D) or (E). *See In re J.M.C.A.*, 31 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (terminating parental rights of mother who allowed children to remain with abusive father).

Viewing all the evidence in the light most favorable to the jury's findings, and considering any undisputed evidence to the contrary, we conclude that a jury reasonably could have formed a firm belief or conviction that Mother engaged in a course of conduct that endangered Molly's physical and emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E).

And considering the entire record, including evidence both supporting and contradicting the finding, a jury reasonably could have formed a firm belief or conviction that Mother engaged in a course of conduct that endangered Molly's physical and emotional well-being. *See id.*[5]

## D. Best Interest Finding

The best-interest inquiry focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). A best-interest determination is guided by several nonexclusive factors, including: (1) the child's emotional and physical needs; (2) present and future emotional and physical danger to the child; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent–child relationship is improper; and (7) any excuse for the parent's acts or omissions. *Id.* (the "*Holley* factors," citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set forth in Family Code section 263.307. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29. Proof of each

---

[5]   Because only one predicate ground is necessary to support termination, we need not consider Mother's challenge to the legal and factual sufficiency of the evidence supporting the jury's finding under Family Code section 161.001(b)(1). *See In re N.G.*, 577 S.W.3d 230, 233 (Tex. 2019).

of these factors is not a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. The analysis may include direct and circumstantial evidence, the totality of the evidence, and subjective factors. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

Striking throughout this case is the consistency with which Molly, who was 12 years old at time of trial, has strongly expressed her desire not to visit or speak with Mother. Because of this, the trial court did not require Molly to have visitation with Mother during the time she has been in care. Molly is happy in her current fictive kin placement and has expressed her interest in remaining there "forever."

Molly's caregiver and medical provider testified that Molly came into care with certain physical symptoms that were resolved with treatment. DFPS worker Grayson, Molly's therapist, and Molly's caregiver all testified that Molly had made significant progress since she first came into care, becoming more expressive, independent, and able to care for herself.

Mother testified that she planned to enroll Molly in a private boarding school in the Washington, D.C. area. But Mother, still dismissive of the possibility that Molly was telling the truth, did not address how she would protect Molly from the stepfather and brother whom she has accused of abusing her.

Molly's guardian ad litem testified that she believed Mother "lacke[d] protective capacity" and could not meet Molly's emotional or physical needs.

Viewing all the evidence in the light most favorable to the jury's findings, and considering any undisputed evidence to the contrary, we conclude that a jury reasonably could have formed a firm belief or conviction that termination of Mother's parental rights is in Molly's best interest. *See* TEX. FAM. CODE § 161.001(b)(2). And considering the entire record, including evidence both supporting and contradicting the finding, a jury reasonably could have formed a firm belief or conviction that termination of Mother's parental rights is in Molly's best interest. *Id.*

Thus, we hold that the evidence is legally and factually sufficient to support the jury's findings supporting termination of Mother's parental rights.

We overrule Mother's second, third, and fourth issues.

## Sole Managing Conservatorship

In her fifth issue, Mother complains of the trial court's ruling appointing the Department as Molly's sole managing conservator.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *In re J.D.G.*, 570 S.W.3d at 856. We review conservatorship determinations for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856.

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parents challenge to an order terminating her parental rights, the trial court's appointment of DFPS as sole managing conservator is a "consequence of the termination." *In re J.D.G.*, 570 S.W.3d at 856; *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Because Mother did not prevail on any issue she raised in her appeal that changed the portion of the trial court's order terminating her parental rights, the order divested Mother of her legal rights and duties related to Molly. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. As a result, Mother lacks standing to challenge the portion of the order appointing DFPS as Molly's conservator. *See In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.); *In re J.D.G.*, 570 S.W.3d at 856.

We overrule Mother's fifth issue.

## Conclusion

We affirm the trial court's decree terminating the parent-child relationship between Mother and Molly.

Clint Morgan
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.