In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00113-CV


______________________________




SANDRA EARL VAIL, Appellant



V.



DONALD NEAL BROWN, Appellee




 


On Appeal from the 71st Judicial District Court


Harrison County, Texas


Trial Court No. 08-0256




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



I. Factual and Procedural Background

 Sandra Earl Vail and Donald Neal Brown (1) were divorced in Louisiana. The judgment
included orders that Brown pay Vail child support. Years later, Brown filed an action in Harrison
County, Texas, and obtained a default judgment reciting that he had overpaid his child support
obligation. Vail now appeals the trial court's order denying her bill of review to set that judgment
aside based on improper service of citation. After examining the record, we find a fatal deficiency
in purported service on Vail in the proceedings below. The bill of review should have been granted,
and we find the trial court abused its discretion in failing to do so. Accordingly, we reverse the trial
court's ruling and remand this case for further proceedings. (2) 

 In 2004, Brown filed a suit affecting parent-child relationship in Harrison County, Texas,
which attempted to incorporate, if not register, the Louisiana divorce and its child support
obligations. See Tex. Fam. Code Ann. § 159.601 (Vernon 2008). 

 The record shows that in September 2007, Brown obtained service on Vail of a notice of
hearing for reinstatement and final orders. A little more than a week later, though, Brown attempted
to serve Vail with an "Original Petition to Modify the Child Support Order." This service was
attempted at the same address as the "Notice of Hearing" that had been successfully served
September 20. However, on September 28, although the private process server filed an affidavit
saying he heard activity in the house and waited two hours, there was no answer at the door. As a
result, Brown made a motion for substituted service. An order granting such service was signed by
a visiting judge, but the order was not filed. (3) Sometime around October 5, 2007, Brown again sought
to serve Vail with the petition to "modify child support." It is Brown's position that his process
server left a copy of the petition and order allowing substituted service on the door at the address
where the September 20 service had been accomplished. Vail testified that she did not receive the
citation, she was in Louisiana at the time, and that address was not her residence. She became aware
that a judgment had been granted when she appeared in a Louisiana court on a motion to enforce
child support against Brown. However, and of prime significance to the instant appeal, the return
of citation for the purported substituted service is not verified. Brown concedes that service was
invalid and that the order denying the bill of review in trial court cause number 08-0256 should be
reversed and that case be remanded for a new trial. (4) 

 The trial court entered a default judgment in Brown's favor on October 30, 2007. The
judgment recognized that a Louisiana judgment entered in February 1994 had found that Brown
owed $32,697.58 in past due child support payments; that Brown had paid in full all his owed child
support; and that "the total amount [husband] should have paid was $54,188.67 and the amount
[husband] actually paid was at least $79,893.72 by December 31, 2005." While the judgment finds
Brown owed Vail no further support payments, the only award it makes is for $2,500.00 in attorney's
fees. 

II. Bill of Review

 A bill of review is an independent action to set aside a judgment that can no longer be
challenged by a motion for new trial or appealed. Wembley Inv. Co. v. Herrera, 11 S.W.3d 924,
926-27 (Tex. 1999). A bill of review is usually a direct attack on a previous trial court's judgment. 
Fernandez v. Frost Nat'l Bank, 267 S.W.3d 75, 81 (Tex. App.--Corpus Christi 2008, pet. filed);
Pursley v. Ussery, 937 S.W.2d 566, 567 (Tex. App.--San Antonio 1996, no writ). In order to be
entitled to relief on a bill of review, a petitioner must plead and prove 1) a meritorious defense,
2) that he or she was prevented from making due to the fraud, accident, or wrongful act of his or her
opponent, and 3) that the failure to appear was unmixed with any fault or negligence of his or her
own. Ross v. Nat'l Ctr. for the Employment of the Disabled, 197 S.W.3d 795, 797 (Tex. 2006). 
Further, the petitioner must normally show that he or she exercised due diligence to assert all
adequate legal remedies before filing the bill of review. Caldwell v. Barnes, 975 S.W.2d 535, 537
(Tex. 1998). 

 In reviewing the grant or denial of a bill of review, every presumption is indulged in favor
of the court's ruling, which will not be disturbed unless it is affirmatively shown that there was an
abuse of judicial discretion. Nguyen v. Intertex, Inc., 93 S.W.3d 288, 293 (Tex. App.--Houston
[14th Dist.] 2002, no pet.); Harris v. Elm Oil Co., 183 S.W.2d 216, 218 (Tex. Civ. App.--Texarkana
1944, writ ref'd w.r.m.). The trial court may be reversed for abusing its discretion only if it has acted
in an unreasonable or arbitrary manner, or without reference to any guiding rules and principles. 
Nguyen, 93 S.W.3d at 293.

 However, the absence of proper service alters the availability of a bill of review. When a
party has not been properly served, a party is not required to establish all of the elements normally
required for relief on a bill of review. A party who was "not served with process is entitled to a bill
of review without a further showing, because the Constitution discharges the first element, and lack
of service establishes the second and third." Ross, 197 S.W.3d at 797. This is true even if a party
becomes aware of the proceedings and fails to participate. A party, who has acquired knowledge but
was not properly served, has no duty to participate in the proceedings. Caldwell v. Barnes, 154
S.W.3d 93, 97 n.1 (Tex. 2004); Wilson v. Dunn, 800 S.W.2d 833, 837 (Tex. 1990) ("[M]ere
knowledge of a pending suit does not place any duty on a defendant to act."). Although diligence
is required from properly served parties or those who have appeared, those not properly served have
no duty to act. Ross, 197 S.W.3d at 797-98. 

 Several appellate opinions, in bill of review proceedings, have concluded that a defective
service of process has the same legal effect as if the party had received no service of process. 
Rodriguez v. Uvalde Care Ctr., L.L.C., No. 04-04-00269-CV, 2004 Tex. App. LEXIS 9007, at *3-5
(Tex. App.--San Antonio Oct. 13, 2004, no pet.) (because the return did not recite that citation was
delivered to defendant by serving its registered agent, the service of process was invalid);
Gunnerman v. Basic Capital Mgmt., Inc., 106 S.W.3d 821, 826 (Tex. App.--Dallas 2003, pet.
denied) (without proper service defendants were not required to file an answer); Granderson v. Ross,
No. 14-03-00296-CV, 2004 Tex. App. LEXIS 2633 (Tex. App.--Houston [14th Dist.] Mar. 25,
2004, no pet.) (defendant did not receive a complete petition). Here Brown has conceded that service
of citation was defective and has prayed that we remand the case. When an issue is conceded, the
court need not decide it. Jochec v. Clayburne, 863 S.W.2d 516, 522 (Tex. App.--Austin 1993, no
writ).



 Here, the record shows an absence of verification of Brown's alleged service of Vail by
substituted service, and Brown does not contest this apparent error. The trial court erred in failing 

to grant Vail's bill of review. Accordingly, the default judgment against Vail is reversed, and this
cause is remanded to the trial court for further proceedings. (5) 



 Jack Carter

 Justice 


Date Submitted: August 19, 2009

Date Decided: October 16, 2009


 

1. In the briefing and even in the record, Vail's name is usually spelled "Vail." However, in
at least one order, and on the cover of her appellate brief, her name is spelled "Vale." Also, in
several locations, her former husband refers to her as Sandra Vail Knowles. Vail testified she was
engaged to a Mr. Knowles, but does not refer to herself with that surname. Her former husband is
referred to variously as Neal Noble or Donald Neal Brown. For the sake of simplicity and
consistency, we will refer to the parties as "Vail" and "Brown." 
2. Vail appeals two trial court rulings in a single brief. Please see our opinion in cause number
06-08-00114-CV, issued on even date herewith. 
3. Brown claimed, before the trial court and this Court, that when he was made aware of the
absence of this order in the trial court's file, he located the original and filed it, perhaps in April
2008. However, nowhere in the record before this Court do we find a file-marked copy of this order. 
The order was offered and received as an exhibit at the July 11, 2008, hearing. 
4. Brown concedes that the lack of verification on the return of citation divested the trial court
of jurisdiction and Vail's bill of review should have been granted. He further argues that the proper
remedy is a remand to the trial court "in light of the fact that this minor defect can be cured upon a
Rule 118 T.R.C.P. motion." At this time, no amendment has been attempted and that issue is not
before us; consequently, we do not address the possibility of amending the return or the effect of
such an amendment. 
5. Rule 123 of the Texas Rules of Civil Procedure provides: 

 

 Where the judgment is reversed on appeal or writ of error for the want of service, or
because of defective service of process, no new citation shall be issued or served, but
the defendant shall be presumed to have entered his appearance to the term of the
court at which the mandate shall be filed.


Tex. R. Civ. P. 123; see Ross, 197 S.W.3d at 797 (setting aside the default judgment and remanding
for trial on the merits of the underlying allegations); Frazier v. Dikovitsky, 144 S.W.3d 146, 149
(Tex. App.--Texarkana 2004, no pet.) (setting aside final prior judgment and remanding for further
proceedings). Rule 123 has been applied to bills of review as well. See Smith v. Commercial Equip.
Leasing Co., 678 S.W.2d 917, 918 (Tex. 1984); McKanna v. Edgar, 388 S.W.2d 927, 930 (Tex.
1965); Avila, 991 S.W.2d at 499; see also Doue v. Texarkana, 757 S.W.2d 801, 803 (Tex.
App.--Texarkana 1988) (op. on reh'g) (vacating default judgment and remanding for new trial).


0;              iii.       Predicate Act C—Child-Endangering Controlled Substance Use—was
supported by legally and factually sufficient evidence.
            b.         The evidence was legally sufficient to show that termination was in the children's
best interest.
1.         Form of Jury Submission was Proper (addressing James' second point of error)
            The State's petition for termination alleged three statutory grounds or predicate acts as
authorized by Section 161.001(1)(D), (E), and (P) of the Texas Family Code. See Tex. Fam. Code
Ann. § 161.001(1)(D), (E), and (P) (Vernon 2002). The jury charge did not require the jury to make
a specific finding on each statutory ground, instead charging the jury that termination was authorized
if at least one of three predicate acts occurred:
For the parent-child relationship in this case to be terminated, it must be proven by
clear and convincing evidence that at least one of the following events has occurred:
"KIMBERLY JAMES has knowingly placed or knowingly allowed the
children to remain in conditions or surroundings which endanger the physical or
emotional well-being of the child; OR
"KIMBERLY JAMES has engaged in conduct or knowingly placed the child
with a person who engaged in conduct which endangers the physical or emotional
well-being of the child; OR
"KIMBERLY JAMES has used a controlled substance, as defined by Chapter
481, Health and Safety Code, in a manner that endangered the health or safety of the
child, and (1) failed to complete a court-ordered substance abuse treatment program;
or (2) after completion of a court-ordered substance abuse treatment program
continued to abuse a controlled substance.

                        . . . .
 
QUESTION NO. 1
Should the parent-child relationship between KIMBERLY JAMES and the
children be terminated?
Answer "Yes" or "No" as to each child:

            James contends the trial court erred in denying her request that the jury be asked to decide
separately which of the three alleged statutory grounds had occurred. She contends this method
should have been used instead of the disjunctive charge and broad questions format that was used.
            We review alleged error in submission of a jury question under an abuse of discretion
standard. See Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990). A trial court's
discretion in submitting a question to the jury is abused if the submission is arbitrary, unreasonable,
and without reference to any guiding rules or principles. See Goode v. Shoukfeh, 943 S.W.2d 441,
446 (Tex. 1997).
            In all jury cases, the court shall, whenever feasible, submit the cause on broad-form
questions. Tex. R. Civ. P. 277; see In re B.L.D.,113 S.W.3d 340, 348 (Tex. 2003). The Texas
Supreme Court has determined that Rule 277 applies in proceedings to terminate parental rights, thus
resolving this issue contrary to James' position. See E.B., 802 S.W.2d at 649. In upholding
submission of questions to the jury in broad form very similar to those submitted in the instant case,
the Texas Supreme Court explained how E.B.'s argument focused on the wrong question:
The controlling question in this case was whether the parent-child relationship
between the mother and each of her two children should be terminated, not what
specific ground or grounds under § 15.02


 the jury relied on to answer affirmatively
the questions posed. All ten jurors agree that the mother had endangered the child
by doing one or the other of the things listed in § 15.02.
Id. The Texas Supreme Court has impliedly affirmed its holding in E.B. See In re B.L.D., 113
S.W.3d at 354–55 (concluding the charge "follows our precedent in E.B., tracks the statutory
language of the Family Code, and comports with Texas Rules of Civil Procedure 277 and 292").             Despite E.B.'s holding, several other biological parents have advanced this "ten jurors"
argument. The issue has repeatedly been resolved against them. See In re J.M.M., 80 S.W.3d 232,
249 (Tex. App.—Fort Worth 2002, pet. denied) ("We cannot agree . . . that broad-form jury charge
submissions are per se violative of due process in termination cases."); In re K.S., 76 S.W.3d 36, 49
(Tex. App.—Amarillo 2002, no pet.) ("We are bound to follow E.B. unless the Texas Supreme Court
overrules or vitiates it."); In re M.C.M., 57 S.W.3d 27, 31 n.2 (Tex. App.—Houston [1st Dist.] 2001,
pet. denied) ("E.B. has not been overruled, and this Court must follow it.").
            We, too, are bound by E.B. It permits submission of a disjunctive question regarding a
parent's predicate act or omission under Section 161.001(1). Here, we have such submission and
conclude the trial court did not abuse its discretion in overruling James' objection to the jury charge. 
We overrule James' second point of error, related to the jury charge.
2.         Evidence was Sufficient to Show At Least One Predicate Act and that Termination was in 
 Children's Best Interest

            A court may order involuntary termination of parental rights only if the court finds that (1) a
parent has committed a predicate act or omission harmful to the child, and (2) termination is in the
best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 2002). Any complaint that the
evidence is legally or factually insufficient to support the findings necessary for termination is
analyzed by a heightened standard of appellate review. See In re J.F.C., 96 S.W.3d 256, 266 (Tex.
2002); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002).
            In reviewing the legal sufficiency of the evidence, we view all the evidence in a light most
favorable to the finding to determine whether a reasonable trier of fact could have formed a firm
belief or conviction that its findings were true. Tex. Fam. Code Ann. § 101.007 (Vernon 2002);
In re J.F.C., 96 S.W.3d at 266; In re C.H., 89 S.W.3d at 25. If, in light of the entire record, the
disputed evidence that a reasonable trier of fact could not have credited in favor of the finding is so
significant that a trier of fact could not reasonably have formed a firm belief or conviction, then the
evidence is factually insufficient. In re J.F.C., 96 S.W.3d at 266.
 
            a. Evidence was Legally and Factually Sufficient to Show at Least One Predicate Act
            After review of the record, we find legally and factually sufficient evidence to support each
of the three alleged predicate acts, though support for any one of the three would be sufficient to
support the necessary finding of a predicate act.
                        i. Predicate Act A—Knowingly Putting Children in Endangering Conditions—was 
 Supported by Legally and Factually Sufficient Evidence (addressing James' third 
 point of error)

            James contends the evidence is insufficient to establish by clear and convincing evidence that
she "knowingly placed or knowingly allowed children to remain in conditions or surroundings which
endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(D). 
Under this section, we must examine the time before the children's removal to determine whether
the environment itself posed a danger to the child's physical or emotional well-being. Ybarra v. Tex.
Dep't of Human Servs., 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi 1993, no writ); In re
S.H.A., 728 S.W.2d 73, 84 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). "Endanger" means more than
a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment; it
means to expose to loss or injury, to jeopardize. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d
531, 533 (Tex. 1987); In re A.B., 125 S.W.3d 769, 776–77 (Tex. App.—Texarkana 2003, pet.
denied). Thus, surroundings can endanger the well-being of a child without the child suffering actual
physical injury. In re A.B., 125 S.W.3d at 777. Subsection (D) of Section 161.001(1) permits
termination of parental rights based on a single act or omission by the parent. Id. at 775.
            Without question, sexual abuse is conduct that endangers a child's physical or emotional
well-being. See id.; In re R.G., 61 S.W.3d 661, 667 (Tex. App.—Waco 2001, no pet.); In re King,
15 S.W.3d 272, 276 (Tex. App.—Texarkana 2000, pet. denied). Parental knowledge that an actual
offense has occurred is not necessary; it is sufficient that the parent was aware of the potential for
danger and disregarded that risk. In re A.B., 125 S.W.3d at 775; In re R.G., 61 S.W.3d at 667–68;
In re Tidwell, 35 S.W.3d 115, 118 (Tex. App.—Texarkana 2000, no pet.). The aggravated sexual
assault of a child in the home is conduct we may infer will endanger the physical and emotional well-being of other children in the home who may discover the abuse or may be abused themselves. In
re R.W., 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied); In re King, 15 S.W.3d
at 276. Thus, Darren's reputed sexual abuse of L.C. created surroundings which not only endangered
L.C., but also endangered the other four children in the household.
            The record reveals ample evidence that James, at a minimum, knew of the potential for
danger of sexual abuse by Darren and failed to adequately protect the children from that risk. One
of the children, L.C., testified that from the time she was six years of age Darren sexually abused
her by having sexual intercourse with her, and that at some point in time L.C. told James. James
explained that in response she started watching Darren around the children and staying up late. She
would put all the children in one room and try to stay at home more often. Such measures, while
inadequate to sufficiently protect the children, demonstrate that James was aware of a risk of
endangerment. James also testified that, during the two weeks since she heard about the sexual
abuse, she had made one attempt to report the matter to the police. The police station was closed
at the time, however, and no other attempt was made. Such a step, again inadequate to protect the
children, does indicate James was aware of a potential for danger and allowed the children to remain
in this environment despite the risk. In fact, for some unexplained reason, James rejected her
grandmother's offer to let L.C. stay at her house in order to get away from Darren. 
            The record also reveals endangering conditions other than those relating to sexual abuse.
James admits Darren was probably physical with the children when she was not around. Despite the
likelihood, she left the children in Darren's care. Further, James admitted she abused alcohol for
many years, from approximately 1992 to 2002. She also admitted she had been abusing cocaine for
approximately one year before the children's removal. Her long history of drug and alcohol abuse
lends itself to an unstable home environment and weighs in favor of termination of her parental
rights. See In re A.B., 125 S.W.3d at 777.
            Based on the foregoing evidence, we conclude the evidence was sufficiently clear and
convincing to support the trial court's finding on this point. Looking at the evidence in a light most
favorable to the finding of the trial court, we conclude a reasonable trier of fact could have formed
a firm conviction that James knowingly placed or allowed her children to remain in conditions or
surroundings that endangered their physical or emotional well-being. Also, the disputed evidence
on the matter is not so significant that the jury could not have formed a firm conviction or belief that
its finding was true. We overrule James' third point of error.


 
                        ii. Predicate Act B—Knowingly Exposing Children to Endangering Conduct—was 
 Supported by Legally and Factually Sufficient Evidence (addressing James' fourth 
 point of error)

            James' fourth point of error asserts that the evidence is factually and legally insufficient to
support a finding she "engaged in conduct or knowingly placed the child with persons who engaged
in conduct which endangers the physical or emotional well-being of the child." See Tex. Fam. Code
Ann. §161.001(1)(E). Here, our inquiry, unlike that under Section 161.001(1)(D), focuses on
conduct of either the parent or a person with whom the parent has placed the children. See In re
A.B., 125 S.W.3d at 777. The evidence must show a "course of conduct," while subsection (D)
permits termination based on a single act or omission. Id. We use the same definition of "endanger"
as we do in our inquiry under subsection (D). That is, we look for more than a threat of metaphysical
injury or the possible ill effects of a less-than-ideal family environment; we look for a course of
conduct which exposes the children to loss or injury or which jeopardizes the children. See Boyd,
727 S.W.2d at 533. Here, we look not only at evidence regarding the parent's active conduct, but
also evidence showing the parent's omissions or failures to act. In re A.B., 125 S.W.3d at 777.
            Placement with an abusive parent or relative is endangerment under subsection (1)(D) or
(1)(E) of Section 161.001. In re J.M.M., 80 S.W.3d at 242 (citing In re J.M.C.A., 31 S.W.3d 692,
698 (Tex. App.—Houston [1st Dist.] 2000, no pet.); In re W.S., 899 S.W.2d 772, 778 (Tex.
App.—Fort Worth 1995, no writ)). If the parent whose rights are at issue did not have notice that
the other parent was abusive or had violent tendencies, however, placing the child with that parent
will not be endangerment. See In re D.J., 100 S.W.3d 658, 669 (Tex. App.—Dallas 2003, pet.
denied). Here, the record supports the conclusion that James had notice of Darren's sexual abuse.
            James testified she had heard the sexual abuse allegations before authorities learned of L.C.'s
allegation and removed the children from the home. The record indicates that all five children were
living in the household during the time after James learned of the sexual abuse and before their
removal from the home. James' failure to protect the children adequately, even after having been
told about the sexual abuse, represents a course of conduct which endangered the well-being of the
children. Without the protection of their mother, the children may suffer continued abuse and may
feel less inclined to report any abuse.
            There is evidence of sexual abuse by Darren. L.C., twelve years old at the time of trial,
testified Darren had abused her since she was six years old. Without question, these years of sexual
abuse certainly represent a course of conduct that endangered the well-being of the children. See In
re King, 15 S.W.3d at 276.
            James failed to guard the children and left them with a man whom she had been told was
sexually abusive. Her action in leaving the children in Darren's care, her failure to take sufficient
action to protect them, and Darren's actions provided the jury with legally and factually sufficient
proof to support the finding by clear and convincing evidence that James engaged in conduct or
knowingly placed the children with persons who engaged in conduct which endangered the physical
or emotional well-being of the children. We overrule James' fourth point of error.
                        iii. Predicate Act C—Child-Endangering Controlled Substance Use—was Supported                         by Legally and Factually Sufficient Evidence (addressing James' fifth point of 
 error)

            James also challenges the sufficiency of the evidence to show she used a controlled substance
"in a manner that endangered the well-being of the children." See Tex. Fam. Code Ann.
§ 161.001(1)(P). She contends that, although she admitted having used marihuana and cocaine, she
did not use either substance in a manner that endangered the children.
            We believe James' view that her substance abuse did not endanger her children is misplaced. 
Having to go into drug rehabilitation forced James to leave the children with her cousin, Cassandra
Harris. The record shows that the State removed the children from Harris' care and placed them in
temporary placement when S.C., at age two, suffered a broken femur. While we note that James was
attempting to go through rehabilitation, we also point out it was her drug use that caused her to have
to leave the children in order to attend the program. Because she had to attend the rehabilitation
program, she had to leave the children in unsafe surroundings.
            As previously discussed, James did make at least two attempts at mandatory rehabilitation. 
The Department included such services in its family services plan designed for the family. James
continued to use drugs even after completion of the rehabilitation program, knowing that doing so
could lead to termination of her parental rights. In fact, she admits having used cocaine for at least
a year before the removal of the children. The children, especially the younger two, J.J. and B.J.,
experienced a great deal of trauma when the children were removed from their home and their
mother. This disruption and trauma in the children's lives is directly caused, at least in part, by
James' drug use.
            The jury is free to use common sense and apply common knowledge, observation, and
experience gained in the ordinary affairs of life when giving effect to the inferences that may
reasonably be drawn from the evidence. United States v. Heath, 970 F.2d 1397, 1402 (5th Cir.
1992). It was authorized, then, to determine that a mother with a long history of drug and alcohol
abuse, who therefore had several encounters with the Department and who admitted abusing cocaine
for at least one year, used a controlled substance in a manner that endangered the well-being of her
children. Viewing the evidence in a light most favorable to the jury's finding, we conclude a
reasonable trier of fact could have formed a firm belief or conviction that its findings were true. 
Additionally, the disputed evidence that a reasonable jury could not have credited in favor of the
finding is not so significant to prevent it from forming a firm belief or conviction, making the
evidence factually sufficient. 
            b. Evidence was Legally Sufficient to Show that Termination was in Children's Best              Interest (addressing James' first point of error)

            Under Section 161.001, in addition to finding at least one predicate act, the trier of fact must
find that termination is in the best interest of the child. See Tex. Fam. Code. Ann. § 161.001(2). 
There is a strong presumption that the best interest of the child is served by keeping custody in the
natural parent. See In re D.M., 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.).
            When determining the best interest of the child, a court should consider the following factors:
(1) the desires of the child; (2) the emotional and physical needs of the child now and in the future;
(3) the parental ability of the individuals seeking custody; (4) the programs available to assist these
individuals to promote the best interest of the child; (5) the plans for the child by these individuals
or by the agency seeking custody; (6) the stability of the home or proposed placement; (7) the acts
or omissions of the parents which may indicate that the existing parent-child relationship is not a
proper one; and (8) any excuse for the acts or omissions of the parent. See Holley v. Adams, 544
S.W.2d 367, 371–72 (Tex. 1976). However, best interest does not require proof of any unique set
of factors, nor does it limit proof to any specific factor. In re H.R., 87 S.W.3d 691, 700 (Tex.
App.—San Antonio 2002, no pet.).
            Evidence of the children's desires is extremely limited. L.C. testified she and her siblings
wanted to go home with their mother. She described a loving, happy relationship between the
children and James. There is no other evidence of the desires of the children.
            The emotional and physical needs of the children suggest that termination is in their best
interest. James learned of L.C.'s claims of sexual abuse before L.C.'s report to the abuse hotline. 
In response to L.C.'s claims, James testified she stayed awake more when L.C. was in the home. 
James failed to meet the emotional and physical needs of L.C. who, having experienced years of
sexual abuse by her stepfather, would naturally need her mother's comfort and support. L.C. stated
she did not know whether her mother believed her. She testified that, when she first told her mother
about the abuse, her mother would "give her a whooping." Later, James' actions and statements
when the children were removed indicate James still may not have believed L.C. James testified
that, at the time, she did not know what to believe. Based on her previous reactions to L.C.'s outcry,
it would appear James is ill-equipped to respond to any future emotional needs resulting from the
sexual abuse. 
            Further, there is evidence in the record of medical neglect of the children when James failed
to take S.C. to the doctor when he had been running a fever for weeks. There is also evidence of
James failing to provide the children with adequate clothing to protect them from the cold weather. 
 
            Evidence concerning James' parenting ability and her failure to use available programs
suggests that termination is in the children's best interest. The record reveals at least eleven incidents
or investigations involving the Department between December 1996 until the removal of all the
children in September 2003. Admittedly, a mere complaint or investigation, alone, proves nothing. 
By James' own admission, however, she abused alcohol regularly from 1992 to 2002. She also
admitted using marihuana and cocaine at least throughout the year before the removal of the
children. James tested positive for cocaine in November 2003, shortly after removal of the children. 
James also admits she relinquished her parental rights to A.J., a son born in 1996, who suffered from
fetal alcohol syndrome. From the record, it does not appear James has developed any long-term
parenting skills or has benefited from the many services and programs the Department has provided
her over the years.
            Further, James offered the jury many excuses for her acts and omissions. She blames the
Department and claims that most of her involvement with the Department was instigated by
telephone calls from someone who was "out to get her." The blame-shifting and conspiracy theories
illustrate James' failure to take responsibility for her actions and inactions. Ultimately, this attitude
would likely inhibit any improvements or growth within the family.
            James is correct in stating there is no evidence of the children's foster home environment. 
However, this factor is not dispositive. Thus, an absence of evidence supporting this particular
factor will not be fatal to the jury's finding that termination is in the children's best interest. See In
re H.R., 87 S.W.3d at 700.
            Based on James' actions, her inactions, her history of drug abuse, and her failure to take
responsibility for and remedy past problems, we conclude the evidence was legally sufficient to
support the jury's determination that termination was in the best interest of the children. Even though
James testified she completed certain services under the Department's plans and participated in
positive activities with the children, we conclude the evidence was factually sufficient to support the
trial court's finding that termination was in the best interest of the children. We overrule her
contention to the contrary.
Conclusion
            Having found no error in the jury charge and having found legally and factually sufficient
evidence in the record to support the jury's findings as to termination, we overrule all James' points
of error and affirm the trial court's termination of her parental rights.
 
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          June 18, 2004
Date Decided:             September 16, 2004

APPENDIX
Factual and Procedural Background
            Kimberly Choyce James and Darren James had been married three years and had previously
lived together since 1995 in Waskom, Texas. James and Darren had three children together: A.J.,
B.J., and J.J. James has three other children from earlier relationships: a daughter L.C., a son L.C.,
and S.C. In 1997, James relinquished her parental rights in A.J. who was born sixteen weeks
prematurely with fetal alcohol syndrome and, as a result, had special needs James could not meet. 
At the time of the hearing on the State's petition for termination, the children whose interests were
at stake were as follows: daughter L.C., age 12; son L.C., age 10; son S.C., age 9; son J.J., age 5;
and daughter B.J., age 4. 
            James' involvement with the Department began December 24, 1996, when hospital staff
reported physical and medical neglect of A.J., who was still hospitalized since his birth in May 1996. 
The hospital reported that James had had very little contact with A.J. and that she was reluctant to
participate in the training offered to help her meet A.J.'s special needs. The Department worked with
James, getting her the proper assistance so A.J. could be released to her. 
            On March 4, 1997, the Department again received allegations of physical and medical neglect
of A.J. He had lost one pound and had failed to thrive while in James' care. A.J. was hospitalized
again, and the Department reopened the case and provided family preservation services for the
family, including weekly services in order to help James meet the needs of her family. 
            On July 28, 1997, only ten days after A.J. had been released to James a second time, the
Department received another call concerning his health. A.J. 's condition had deteriorated, and he
was again hospitalized. A.J. was removed from James' care. She would later voluntarily relinquish
her parental rights to A.J. James was admitted into a drug and alcohol abuse treatment program. 
During this time, the five other children were placed in the care of James' cousin, Cassandra Harris,
at James' request. 
            On September 2, 1997, while James was still in rehabilitation and while the children were
in the care of Harris, the Department received a report of neglectful supervision in connection with
two-year-old S.C.'s broken leg. The Department removed the children from Harris' care and
temporarily placed them outside the home. The Department offered James psychological and
counseling services. She participated in a post-treatment drug program and parenting classes. Her
five remaining children were returned to her care March 5, 1998.
            Approximately three months later, in June 1998, the Department received a report alleging
physical abuse of S.C. by James. The report alleged that a drunken James lifted S.C. by his arm and
shook him vigorously. The Department could not gather enough information to confirm the
allegations of abuse. Thus, the case was "ruled out with factors controlled."


 
            On April 13, 2000, a report of neglectful supervision of the four younger children came into
the Department. Allegations were made concerning James' drug use in the home. James' drug screen
tested negative, and the case was closed. 
            On May 23, 2001, the Department received a report alleging James had hit S.C. in the mouth,
causing a swollen lip. S.C. later recanted the story that his mother hit him and told varying stories
concerning the injury. He finally stated he could not remember how he received the injury. During
the investigation, the Department discovered S.C. had been ill with a fever for over a month. The
Department put in place a safety plan in which James was required to obtain medical attention for
S.C. and report to the Department. The case was then closed.
            On December 31, 2001, the Department received another report of physical abuse of S.C. by
James. S.C. had another lip injury, this time a split lip, reportedly a result of James' discipline. The
report also alleged S.C. had mimicked preparation for intravenous drug use. During the
investigation, Department staff became concerned that S.C. was not properly dressed for the winter
weather. S.C. denied all the allegations. The Department implemented a safety plan regarding
proper cold weather clothing and appropriate discipline. James explained that the injury was due
to chapped lips. 
            The Department received another report February 19, 2002, regarding James' drug use. The
Department investigated a case of neglectful supervision of J.J. and B.J. Allegations made accused
James of smoking marihuana in front of her two youngest children. James' drug screen came back
negative for marihuana use, and the Department closed the case. 
            On March 25, 2002, the Department received more allegations of physical abuse of one of
her children. The caller reported that James was heard yelling for someone to bring her a belt. 
Shortly thereafter, a child was heard screaming for about fifteen minutes. There were also more
allegations that James used drugs in front of her children. The children denied the allegations that
they were physically abused. The Department requested another drug test. Since the February 19,
2002, case was still pending at this time, the Department closed this case by combining it with the
February case. 
            Finally, on September 16, 2003, the most recent involvement with the Department began
when a family friend called daughter L.C.'s school and informed school officials of the allegations
of sexual abuse by Darren. School officials called the police, who then called the Department. L.C.
gave a written statement to police describing years of sexual abuse by her stepfather. Mandy Bryan,
an investigator with the Department, went to the junior high school, where she spoke with the chief
of police and obtained additional information from L.C. L.C. stated she did not feel safe returning
to her house. Based on L.C.'s statement, Bryan went to the house to conduct an interview of the
parents and determine whether the children should be removed during the investigation.
            After Bryan arrived and explained her purpose for being there, Darren just smiled and shook
his head. James became very upset and claimed she did not know about the allegations. Bryan
asked James to suggest a safe place for the children during the investigation of the abuse allegations,
and James responded she knew of no one whom she trusted. James then stated that the Department
should just take the children, that they would just take them anyway. She stated she just did not care
anymore. 
            According to Bryan, while the children were packing some of their things, James stated
"[L.C.] started all of this mess and she would get hers." James denied ever having made such a
statement. Since James could not provide the Department with a suitable home in which the children
could be placed temporarily, the Department began a full removal of the children, including a
petition for termination of the parent-child relationship. The children were placed in foster care. 
            The day after L.C.'s outcry and the removal of the five children from the home, the
Department filed its Petition for for Protection of a Child, for Conservatorship, and for Termination
in a Suit Affecting the Parent-Child Relationship. On January 14, 2004, the trial court heard the
Department's petition. The Department presented evidence supporting L.C.'s allegation of sexual
abuse, evidence of the prior cases concerning James, evidence of James' drug and alcohol abuse, and
evidence that L.C. had told her mother of the sexual abuse before her outcry. James presented
evidence of her attempts to protect the children, evidence of the pleasant things the family does
together, evidence of her recovery from drug and alcohol abuse, and evidence that Darren will have
no more contact with the children. The jury found that James had committed an act necessary for
termination and that termination of the parent-child relationship was in the best interest of the
children.