**In the Interest of Patrick DRIVER, A Child,**

**Robert Driver and Beverly Driver, Natural Parents, Appellants.**

No. 66529.

Supreme Court of Iowa.

Oct. 21, 1981.

Curtis Hewett of Smith, Peterson, Beckman & Willson, Council Bluffs, for appellants.

Thomas J. Miller, Atty. Gen., Brent D. Hege, Asst. Atty. Gen., and E. A. Westfall, Asst. Pottawattamie County Atty., for the State.

Considered by REYNOLDSON, C. J., and UHLENHOPP, McCORMICK, McGIVERIN, and SCHULTZ, JJ.

McCORMICK, Justice.

The determinative question in this appeal is whether the evidence was sufficient to support a child-in-need-of-assistance (CHINA) adjudication. The juvenile court found it was. Because we find it was not, we reverse.

The child in this case is a baby, Patrick Driver, born August 24, 1980. His parents are Robert and Beverly Driver. Patrick is an only child.

The CHINA adjudication was based on sections 232.2(5)(b) and 232.2(5)(c)(2), The Code. Section 232.2(5)(b) permits the adjudication when an unmarried child's "parent, guardian or other custodian has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." Section 232.2(5)(c)(2) authorizes the adjudi-

cation when the child "has suffered or is imminently likely to suffer harmful effects as a result of . . . [t]he failure of the child's parent, guardian or custodian to exercise a reasonable degree of care in supervising the child." The term "abuse" is defined in section 232.68(2):

"*Child abuse*" or "*abuse*" means harm or threatened harm occurring through:

a. Any nonaccidental physical injury, or injury which is at variance with the history given of it, suffered by a child as a result of the acts or omissions of a person responsible for the care of the child.

. . . .

c. The failure on the part of a person responsible for the care of a child to provide for the adequate food, shelter, clothing or other care necessary for the child's health and welfare when financially able to do so or when offered financial or other reasonable means to do so . . . .

The State had the burden to establish the grounds for the adjudication "by clear and convincing evidence." § 232.96(2).

Patrick suffered fractures of the left humerus and left femur in the fall of 1980. The State sought to prove that these injuries were the result of child abuse by one of his parents or by someone else because of a lack of proper parental supervision. In contending the evidence was insufficient to support the adjudication, Robert and Beverly assert that the State failed to show when Patrick's injuries occurred, whose custody he was in at the time, or who the perpetrator of the injuries was. In defending the adjudication, the State argues that the grounds for the adjudication were established by circumstantial evidence. Our review is de novo. *In Interest of Blackledge*, 304 N.W.2d 209, 210 (Iowa 1981).

Patrick's injuries were discovered as a result of X rays taken on November 18, 1980. The radiological examination disclosed a recent fracture of the left femur and a healing fracture of the left humerus. The fracture of the humerus was several weeks old. Various tests subsequently administered by physicians disclosed no evidence of osteogenesis imperfecta, sometimes called brittle bone disease. Medical testimony indicated that the injuries therefore resulted from trauma, involving direct force on the femur and a twisting force on the humerus.

In attempting to link these injuries to Patrick's parents the State introduced evidence of several events which had occurred in the previous month.

Robert and Beverly Driver were both employed. They left Patrick in the care of an adult babysitter during Beverly's working hours. On October 24, 1980, Beverly went to the babysitter's home to get Patrick. While Beverly watched, the babysitter began to dress Patrick in a snowsuit so he could be taken outside. While the babysitter was attempting to put Patrick's left arm in the sleeve of the garment in a normal manner, both women heard a loud "pop", after which Patrick began to cry. The babysitter's daughter drove Beverly and Patrick to the Mercy Hospital emergency room where X rays were taken. A physician said Patrick's left elbow had probably been dislocated as a result of "nursemaid's elbow", a routine developmental problem. The X rays did not show any abnormality of the elbow. A radiologist testified in this proceeding that the X rays of Patrick's left arm did not show a break in the humerus. Instead they showed only a prominent periosteal reaction at about midshaft of the bone.

Two days after the October 24 incident, Beverly was playing with Patrick when his left arm suddenly went limp and he began to cry. She immediately took him again to the hospital. The diagnosis was the same as on the prior visit although no X rays were taken. The arm was wrapped in an ace bandage to immobilize it.

During the next two weeks Robert and Beverly continued to take Patrick to the babysitter while Beverly was at work. No further incident occurred until the evening of November 12, 1980. Beverly had picked Patrick up at the babysitter's at about 5:30 p.m. Approximately one hour later, while Beverly was playing with Patrick on her

lap, she heard another popping noise, after which Patrick started crying. She took Patrick to the hospital immediately where X rays were taken of his left knee. The X rays did not disclose any fracture but showed a periosteal reaction. The emergency room physician diagnosed the condition as a possible dislocation of the knee.

On Friday, November 14, 1980, Patrick was cared for by the babysitter. On November 16, the following Sunday, Robert and Beverly were dressing Patrick to take him to have a photograph taken. While Beverly was holding him in her lap, Patrick suddenly kicked his feet straight out and cried in pain. He was again taken to the hospital. On that occasion, X rays of the left leg revealed a fracture of the femur. Patrick was kept in the hospital. On November 18, X rays of his entire body were taken, and the healing fracture of the left humerus was observed for the first time. The radiologist then raised the question of possible child abuse. When osteogenesis tests at the Boys Town Institute in Omaha were negative, the State initiated the present action.

Patrick remained in his parents' custody until January 21, 1981. On that date the State obtained a removal order placing him in foster care. He was continued in foster care under the dispositional order of February 23, 1981. He was returned to his parents on March 25, 1981. Patrick has not been in the care of his former babysitter since November 14, 1980. No evidence of injury has been discovered since November 18, 1980.

The State concedes the incidents which precipitated Patrick's four trips to the hospital were neither child abuse nor the kind of trauma which the doctors said would be necessary to cause the two fractures. Moreover, the State acknowledges it did not show by direct evidence the time when the injuries occurred, whose custody Patrick was then in, or who the perpetrator was. It argues, however, that its evidence ruled out any explanation for the injuries other than that one of the parents inflicted them or that the parents permitted someone else to inflict the injuries in neglect of their supervisory responsibilities.

This argument is unpersuasive. The parents were not Patrick's only custodians during the period in question. He was frequently in the custody of the babysitter. Therefore another person had the opportunity to inflict the injuries. Furthermore, no evidence was adduced to show Robert and Beverly could be charged with notice that Patrick was being abused by the babysitter, if he was. Other than the nonabusive incidents which caused them to take Patrick to the hospital on four occasions, the parents had no reason to believe Patrick had otherwise been injured. It was not until the November 18 X rays that even the physicians believed the possibility of child abuse existed.

Thus the State's evidence did not show either that the parents inflicted the injuries or that the parents should have known that someone else was doing so. Unfortunately the evidence was simply insufficient to show who was responsible for the injuries.

This case is distinguishable from *In Interest of Osborn*, 220 N.W.2d 632 (Iowa 1974), where the child's injuries resulted in part from a mother's neglect in choosing a custodian. Other cases relied on by the State are similarly inapposite.

The evidence in this case is weaker than that which was found to be insufficient to show child abuse in *Higgins v. Dallas County Child Welfare Unit*, 544 S.W.2d 745 (Tex. Civ.App.1976). In *Higgins* the Texas court recognized, as we do, that a finding of child abuse may be supported by evidence of "(1) multiple injuries or other serious impairment of health that ordinarily would not occur in the absence of abuse or gross neglect, and (2) the parents' control over the child during the period when the abuse or neglect is alleged to have occurred." *Id.* at 750. Nevertheless when the child was left in the care of a neighbor during part of the period, and no evidence showed either that the child was endangered there or that the parents knew of any unsafe condition there, the evidence would not support a finding of parental responsibility for injuries which

may have occurred while the child was in the neighbor's care. *Id.* at 750–51.

We find the evidence in the present case insufficient to prove by clear and convincing evidence that Patrick was a child in need of assistance on either ground alleged. We believe the physicians and the persons involved in the bringing of this action proceeded in good faith and from justified concern about Patrick's safety and welfare. The evidence, however, was simply not sufficient to support the adjudication.

We have no occasion to reach the parents' additional contentions. We reverse and remand for dismissal of the State's petition.

REVERSED AND REMANDED.