**IN THE COURT OF APPEALS OF IOWA**

No. 21-1384
Filed January 27, 2022

**IN THE INTEREST OF K.G.,**
**Minor Child,**

**S.G., Mother,**
     Appellant.
_____

     Appeal from the Iowa District Court for Warren County, Mark F. Schlenker,

District Associate Judge.


     A mother appeals the grounds for adjudicating her child to be a child in need

of assistance and the child's removal from her care. **AFFIRMED IN PART AND**

**REVERSED IN PART.**


     Jacob Van Cleaf of Van Cleaf & McCormack Law Firm, LLP, Des Moines,

for appellant.

     Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

     Magdalena B. Reese, Des Moines, attorney and guardian ad litem for minor

child.


     Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

The mother and the father of K.G. are enmeshed in a contentious custody battle as part of their ongoing divorce proceedings. In May 2021, the Iowa Department of Human Services investigated bruising that appeared on K.G.'s leg after he spent a week in the mother's care. This investigation led to K.G.'s removal from her care and formed one basis for the child's adjudication as a child in need of assistance. The mother appeals both the removal and adjudication.

## I.    *Background Facts and Proceedings.*

K.G. was born in November 2018. His parents' custody battle began in June 2020. A temporary order entered as part of the divorce proceedings granted the mother and the father joint physical care of K.G. on alternating weeks. Indicative of the antagonistic nature of their relationship, the order limited the mother's and father's communication to matters involving K.G. through a co-parenting communication service.

The Iowa Department of Human Services has received about one dozen allegations of abuse perpetrated by both the mother and the father. Only one of these reports was founded, and another report was confirmed. The rest were either rejected for assessment or not confirmed upon assessment. The confirmed report of abuse was based on an incident that occurred in March 2020 between the father and the mother's daughter from a prior marriage.[1] A report of abuse by

---

[1] As described in the police dispatch entry and confirmed by a child protective worker at the removal hearing, the daughter "started throwing punches" at the father when he and the mother attempted to take her phone away. The father "had to restrain" the daughter, which caused "some bruising on her wrist and abrasions on her neck."

the mother against K.G. was founded based on a report the department received in May 2021. This founded report against the mother led to the juvenile court proceedings forming the basis of this appeal.

The department began investigating the May 2021 report of suspected child abuse by the mother against K.G. after the child spent a week in the mother's care and returned to the father's care with numerous bruises on his leg. The mother told the father that the bruising occurred when K.G. slipped and fell exiting the shower the night before. At the direction of the department, the father brought K.G. to a clinic where Dr. Robert Hatchitt, an urgent care physician, examined him. The medical chart record from that visit describes "a 10 cm x 8 cm area of what appears to be 3-4 individual bruises" along K.G.'s left thigh. The area is described to be "oblong in shape" with "the lowest bruise run[ning] the length of the leg while the 2 higher ones run transversely across the thigh." There were no other areas of significant bruising on the left side of K.G.'s chest, abdomen, or arm. Although K.G. also had a number of smaller bruises on his knees and shins, they appeared to Dr. Hatchitt to be the kind that result from the normal play of a two-year-old child. But regarding the bruising on K.G.'s thigh, Dr. Hatchitt, who has no specialized training in child abuse, could not "reliably say that the bruise is a strike from a foot or a hand." Yet the father told the child protective worker investigating the incident that Dr. Hatchitt "said it looks like [K.G.] was struck with a hand or object."

The department sent photos of the child's bruises to Dr. Matthew Petty, a pediatrician who has special training and experience in child abuse and neglect. Dr. Petty provides in-patient child abuse consults for a hospital when there is suspected abuse and occasionally consults on specific cases for the department,

county attorneys, and defense attorneys. In response to being asked if K.G.'s bruises were concerning enough to warrant further evaluation, Dr. Petty answered yes. Dr. Petty testified that he did not believe K.G.'s bruising was consistent with a single fall: "There was pretty extensive bruising over different parts of the leg, so I don't think that would be one fall." Specifically, Dr. Petty testified that the bruising was "somewhat concerning and pretty extensive, especially the ones over . . . the fleshier parts of the leg that are higher up and the fact that they are multiple and also round in pattern, which I couldn't definitively [say], but might be suggestive of a grip or a fingertip bruise."[2]

Dr. Petty was then asked, "Is it more likely than not to be a fingertip bruise or a bruise from falling?" He answered, "because of the number of discrete round bruises, I'd be concerned it might be more likely than not . . . a fingertip rather than falling." But Dr. Petty admitted it was "a little hard to assess" based solely on a photograph. At several points during his testimony, Dr. Petty emphasized that in order to provide a more definite opinion, he would need to physically examine a child in person. Dr. Petty stated he would also want to obtain "a more thorough history," which he described as "a conversation with any caretakers that I can talk to" in order to "discuss pretty much at length, almost ad nauseam . . . both what occurred that might have [caused the] injuries and also past medical history."

---

[2] Dr. Petty explained that the cause of a fingertip bruise is not limited to a slap or a hit but can be caused by actions like pinching, squeezing, or grabbing:

> In fact, the patterns that I'm seeing in these pictures would be more consistent with a grip or a grab that . . . was unsafe or was too strong. Since it's a diapered toddler, it'd be like inappropriate care. So picking up the child or dragging the child around by the limb in a violent or strong way is probably more likely than a slap or a hit. But, again, it's a little open-ended . . . .

During the department investigation, the mother provided several explanations for the bruises on K.G.'s leg. The mother continued to maintain that the bruising to the upper leg occurred when K.G. was exiting the shower. She stated that K.G. slipped on wet tile "with his feet coming up from under him," striking the lip of the shower with his hip or upper thigh and hitting the tile with his bottom. The mother stated that the bruises on K.G.'s shins occurred during normal play, though she admitted that they could also have occurred when K.G. climbed up and down her bed frame. Finally, the mother offered that K.G. "does fall down a lot when playing" and "has fallen in a hole the dogs have dug" while playing in the yard.

The State applied to remove K.G. from the mother's care, stating that two physicians examined K.G. and deemed the bruising on K.G.'s left leg to be inconsistent with the mother's explanation. The juvenile court granted a temporary order and later confirmed the removal order after holding a hearing. In the order confirming the child's removal, the court found that the mother gave "as many as four different explanations as to how the bruises had occurred." The court noted that neither doctor "could testify with certainty as to how the bruises were caused," but it found the child's age, coupled with the doctors' testimony and the photographs of K.G.'s bruises, to be "very concerning." The court also noted the parents' divorce proceedings and witness testimony about "the contentious nature of the relationship between the parents and . . . the stressful nature of the relationship upon the child." The court cited the testimony of a department worker who "had concerns about the stability of the mother, adding 'she gets very angered.' [The worker] stated that she had been in mental health counseling since

October 2020." The court conceded that "[n]o professional has seen either parent physically abuse a child." But based on the bruises documented to the child's left leg, Dr. Petty's opinion that the "multiple sizes and shapes of the bruises suggest that they were incurred over multiple times," and "testimony by the [department] professionals that child is being placed in the middle of the dissolution fight between the parents, to the child's detriment," the court confirmed K.G.'s removal from his mother's care and continued placement with his father. Our supreme court denied the mother's application for interlocutory appeal of the order.

Throughout the proceedings, the mother was difficult and demanding to work with. The record shows that the mother sent more than sixty text messages to the department case worker in one day, which included multiple photos of a document outlining a parent's rights. She repeatedly called law enforcement to conduct welfare checks on the child when the father failed to provide her with updates about the child twice daily. The department report to the court states that the department was unable to recommend returning K.G. to the mother's care, noting

> [she] has continued to be ill-mannered with her attitudes and behaviors that has shown she continues to focus on controlling behaviors and disregard what is safe for [K.G.] [The mother] continues to become angry and oppose anyone that is not of the same opinion. While an unpleasant personality is not a reason for removal, one's choices and lack of accountability in one's behaviors that has led to an injury to a child with no engagement in changes leads to an environment that continues to be unsafe as safety cannot be ensured in that environment with a child that cannot report or self-protect.

The father likewise engaged in concerning conduct that appeared to negatively affect K.G. The same report to the court notes that the father "attempt[s] to

escalate [the mother] through lack of communication, along with different providers and appointments."

The State petitioned to adjudicate K.G. a child in need of assistance (CINA) under Iowa Code section 232.2(6)(b) (2021) and 232.2(6)(c)(2). After a hearing, the court entered an adjudicatory order, granting the State's petition on both grounds. The court described the mother's posture at the hearing:

> [T]he mother introduced testimony through testimony of her own mother that the child had been bruised not only at the incident which gave rise to the filing of the petition, while the child was in her care, for which she has offered several alternate explanations, but also that the child had been bruised while in the care of the father . . . . She also testified or introduced testimony that she had taken photographs of prior bruising and submitted them to the [department]. She maintained that she was frustrated because nothing happened by reason of those complaints. It is apparently the mother's contention that this Court should accept her various explanations regarding the bruising of the child when in her care and should not adjudicate the child as a CINA, but asserts that the bruising of the child while in the father's care did give rise to a filing of a CINA petition by [the department], though this was not done. She presumably implies that a [CINA] action should have been filed at that point, but not now. It would appear that even the mother seems to agree that action filed as a CINA action was merited regarding this child, though she disputes the facts upon which the filing should have been made and when it should have been made.

The court also noted that

> the State urges the contentious personal relationship existing between both parents has been harmful to the child and the child has been used as a pawn in all conflicts in their ongoing stormy relationship. [A department worker] testified that the child is repeatedly brought to doctors for multiple examinations and opinions and that he hears negative comments regarding one parent from the other parent. He states both parents are guilty of this harmful conduct.

A dispositional hearing was held in September 2021. Prior to the hearing, the State filed a case plan from the department that, among other things,

recommended that K.G. remain in his father's legal custody. The mother did not contest this recommendation at the hearing. The juvenile court accordingly entered an order continuing K.G.'s placement in his father's care.

The mother appeals, challenging K.G.'s adjudication as a child in need of assistance, as well as his removal from her care. *See In re Long*, 313 N.W.2d 473, 477 (Iowa 1981) (holding an order for adjudication is not final for purposes of appeal until disposition).

## II. Analysis.

"We review CINA proceedings de novo." *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). We give weight to the juvenile court's fact findings, although we are not bound by them. *See id.* "While giving weight to the findings of the juvenile court, our statutory obligation to review adjudication proceedings de novo means our review is not a rubber stamp of what has come before." *In re J.W.*, No. 14-0515, 2014 WL 3749419, at *1 (Iowa Ct. App. July 30, 2014). Our primary concern is the best interest of the child. *See J.S.*, 846 N.W.2d at 40.

### A. Adjudication

In appealing the child's adjudication, the mother only challenges the juvenile court's finding that K.G. is a child in need of assistance under Iowa Code section 232.2(6)(b), which requires the State to prove that a parent "has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." Because "[t]he grounds for a CINA adjudication do matter," challenging just one ground for the CINA adjudication does not render the appeal moot. *J.S.*, 846 N.W.2d at 41. Thus, the only issue before us is whether there is clear and convincing evidence that the mother physically abused K.G. or is imminently likely

to do so.  *See id.*  "Clear and convincing evidence is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt.  It means that there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence."  *In re L.G.*, 532 N.W.2d 478, 481 (Iowa Ct. App. 1995) (citation omitted).

Section 232.2(42) defines "physical abuse or neglect" as "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the child."  For past "physical abuse or neglect," the challenged statutory provision requires the State to prove three things: (1) the child must have sustained a "physical injury"; (2) the "physical injury must have been the result of the acts or omissions of specified persons—a parent, a guardian, a custodian, or other person legally responsible for the child"; and (3) "the physical injury must have been nonaccidental."[3]  *J.W.*, 2014 WL 3749419, at *3.

The mother concedes the child suffered a physical injury while in her care, but she argues there "is not clear and convincing evidence that the injuries in question were nonaccidental."  There is some evidence in the record to support a finding that the injury to K.G.'s leg was nonaccidental.  Dr. Hatchitt, who physically examined the child, told the child protective worker "the bruises should be more solid given the explanation of the child falling on a tile floor."  But when asked,

---

[3] "Nonaccidental physical injury" is not defined in chapter 232, but the administrative rules for child abuse assessments define it as "an injury which was the natural and probable result of a caretaker's actions which the caretaker could have reasonably foreseen, or which a reasonable person could have foreseen in similar circumstances, or which resulted from an act administered for the specific purpose of causing an injury."  Iowa Admin. Code r. 441-175.21.

"Could the bruises have taken place from falling out of a shower?" he answered: "Could be. I don't know." Dr. Hatchitt acknowledged that he could not "reliably say that the child was even struck." And he was unable to tell how old the bruising was. Dr. Hatchitt is not an expert in detecting child abuse injuries, and he had little information about how K.G.'s injury was alleged to have occurred. He testified that if he saw K.G.'s injuries with only the information that he slipped on the floor, fell, and hit the lip of the shower, he would not have felt it necessary to report suspected child abuse to the department.

More weight can be given to the testimony of Dr. Petty, who has additional experience and training in detecting child abuse and consults on cases of suspected child abuse. But Dr. Petty's opinion is limited because he only had access to photographs of K.G.'s injuries and a brief conversation with a department worker. He admitted that he lacked details and informed the worker that K.G. "should be seen in person and re-evaluated more formally." To illustrate, Dr. Petty explained the difference between providing an in-patient consultation at the hospital versus the consulting he does for the department or law enforcement:

> So if there's a child that is in the hospital and I'm consulted to the bedside to take a full history and physical examination, so that would entail discussing the history of any injuries or illnesses acutely with any caretaker that I can talk to, then also a thorough past medical history, allergies, medications, any number of medical concerns, and use of nursing staff and other things to focus on the physical exam and any diagnostics as needed, that would be what I would do as an inpatient consult.
> Outside of an inpatient consult, if I'm ever brought a particular case or question or a more abstract or simple question . . . for [the department] or law enforcement or an attorney like yourself, I'm still willing to offer a limited medical opinion, so wouldn't make a formal diagnosis, but would at least review . . . what limited details I'm given . . . and offer an opinion of what that might entail in terms of risk.

These limitations led to Dr. Petty's hesitancy in stating whether the bruises were nonaccidental. The most he was willing to say was that the "bruising is somewhat concerning and pretty extensive" and "might be suggestive of a grip or a fingertip bruise." Despite this, the court credited Dr. Petty's testimony in finding the mother presented an imminent risk to the K.G.'s health.

In the order confirming K.G.'s temporary removal and again in the adjudicatory order, the juvenile court cited the mother's "alternate explanations" for the child's bruises in reaching its conclusion that the child may face imminent harm in the mother's care. The mother's multiple explanations for K.G.'s bruising was also cited as cause for concern by Drs. Hatchitt and Petty. But a thorough reading of the record indicates that the mother offered explanations for bruising in different areas of the body, not different explanations for a single injury. For instance, the mother told the department worker that the bruises on K.G.'s shins and knees occurred while playing or climbing into bed. This is consistent with Dr. Hatchitt's testimony that described the bruises as appearing to be from normal play for a child of K.G.'s age. It appears that the mother's explanation for the large area of bruising on K.G.'s thigh remained consistent through her retellings. Neither Dr. Hatchitt nor Dr. Petty could discount the mother's explanation of a slip and fall in the shower as a cause for the bruising.

Even if we were to find K.G.'s injury was nonaccidental, that alone is insufficient for a child-in-need-of-assistance adjudication under section 232.2(6)(b). *See In re C.L.B.*, 528 N.W.2d 669, 671 (Iowa Ct. App. 1995) ("We do not accept the argument that because the child suffered an injury, one or both of

her parents must have abused or neglected her, therefore the child must be a child in need of assistance."). The question is whether there is clear and convincing evidence to show that injury was caused by the mother.

In the case of *In re Driver*, 311 N.W.2d 87, 89-90 (Iowa 1981), the State sought a CINA adjudication under what is now section 232.2(6)(c) based on two separate fractures to a child's leg that occurred within several weeks of each other. The child was in the custody of his parents, but they left him with a babysitter when they worked. *Driver*, 311 N.W.2d at 88. The State conceded there was no direct evidence of when the injuries occurred, whose custody the child was then in, or who the perpetrator was. *Id.* at 89. But it argued the grounds for the adjudication were established by circumstantial evidence, claiming it ruled out any explanation for the child's injuries other than one of the parents inflicting them or permitting someone else to inflict them in neglect of their supervisory responsibilities. *Id.*

The supreme court found this argument "unpersuasive," noting the parents were not the only ones caring for the child during this period and that the evidence failed to show the parents had reason to believe someone else was physically abusing the child. *Id.* "Thus the State's evidence did not show either that the parents inflicted the injuries or that the parents should have known that someone else was doing so. Unfortunately the evidence was simply insufficient to show who was responsible for the injuries." *Id.*; *see also, e.g., In re R.K.*, 505 P.2d 37, 38 (Colo. App. 1972) (rejecting the argument that "since there was undisputed evidence that the children did have injuries and that those injuries were either unexplained or poorly explained as to origin by the parents, the court should have, as a matter of law, found the children to be dependent or neglected"); *In re Loitra*,

401 N.E.2d 971, 973 (Ill. App. Ct. 1979) (reversing adjudication of a mother as an "unfit person" based on bruises on child's back and chest while in the mother's custody because "there [wa]s no finding that the injuries were inflicted by respondent" and "the[] injuries could have been inflicted by someone else or incurred in a manner not involving the parents"); *In re D.P.*, 96 S.W.3d 333, 339 (Tex. App. 2001) ("It is undisputed that D.P. sustained injuries to his ribs, but there is no evidence showing how, when, nor by whom the child was injured. Although the evidence suggests that the list of persons who could have caused the injuries can be narrowed to [three], where, as here, circumstances are consistent with either of two or more facts and nothing shows that one is more probable than the other, none may be inferred. Resultantly, absent knowledge of who injured D.P., a finding that [the mother] knowingly placed or allowed him to be subject to an unsafe environment or circumstances is not supported by clear and convincing evidence." (citation omitted)).

We likewise find insufficient evidence to show the mother is responsible for K.G.'s injury. No one witnessed physical abuse perpetrated by the mother against K.G. in May 2021 or on any other occasion. Nor is there a history of physical abuse by the mother against anyone else. *Cf. In re L.H.*, 904 N.W.2d 145, 151-52 (Iowa 2017) (emphasizing the importance of specific prior instances of past abuse on other family members in assessing whether the child was "imminently likely" to be abused). And the record does not include information as to whether anyone else had contact with the child while in the mother's custody. With only one injury alleged and conflicting evidence over whether the injury was nonaccidental, there

is insufficient evidence to adjudicate K.G. a child in need of assistance under section 232.2(6)(b).

But because the mother only challenged that adjudicatory ground, K.G. remains a child in need of assistance under section 232.2(6)(c)(2) (requiring a finding that a child has suffered or is imminently likely to suffer harmful effects as a result of a parent's failure to exercise a reasonable degree of care in supervising the child). *See In re B.M.*, 2021 WL 3661402, at *2 (Iowa Ct. App. Aug. 18, 2021) (finding a challenge to the grounds for adjudication waived where neither parent "advance[d] any factual or legal arguments that the grounds for adjudication were not established"); *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."); *cf. J.S.*, 846 N.W.2d at 41-42 (affirming uncontested adjudicatory ground after noting it was supported by the evidence).

### B.    Removal

We turn next to the question of K.G.'s removal.  The mother focuses on his initial removal from her care, arguing it "was not appropriate, as there was not substantial evidence that the minor child would have faced imminent danger if allowed to remain in [her] care."  *See* Iowa Code § 232.95 (setting forth standard for temporary removal of a child).  Even assuming the juvenile court erred in granting the State's removal application, we "cannot go back in time and restore custody based on alleged errors in the initial removal order."  *In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994).  While we are able to review whether a child's continued removal is appropriate, *see id.* at 872, we question whether the mother

preserved error on that issue since she did not contest the department's recommendation at disposition that K.G. remain in his father's legal custody. *See, e.g.*, *In re J.S.*, No. 17-1028, 2017 WL 4050992, at *1 (Iowa Ct. App. Sept. 13, 2017). Setting aside that concern, we find K.G.'s continued removal from his mother's care was appropriate.

Following a dispositional hearing, "the court shall make the least restrictive disposition" of those "listed in sections 232.100 through 232.102 in order from least to most restrictive." Iowa Code § 232.99(4). Whenever possible, a child should be in the home with a parent unless there is clear and convincing evidence the child "cannot be protected from physical abuse" or "some harm which would justify the adjudication of the child as a child in need of assistance." *Id.* § 232.102(4)(a). As set forth above, the State failed to establish the first ground. But the mother has conceded that the child needs protection from a harm that would justify a CINA adjudication under section 232.2(6)(c)(2).

Although both the mother and the father present a risk of harm, the evidence shows the child is at greater risk in the mother's care. When the department worker was asked whether he had "any safety issues with [K.G.] being with Father," he responded: "No, I do not." But when asked the same question about the mother, the worker testified there were safety issues with her, explaining: "Mom is strictly focused on the issues regarding the district court divorce and those overshadow any safety concern or overshadow the safety of [K.G.]" The record is replete with evidence of the mother's focus being on the father's conduct rather than on the child. She made several reports of suspected abuse by the father, took the child

to numerous doctor's appointments, and requested multiple wellness checks from law enforcement.

One example among many is a medical appointment the mother insisted upon in July 2021 because she was concerned about scrapes on K.G.'s knees and "some ink on his hands." After the visit, which found no concerns with K.G.'s health, the mother called the doctor's office "quite upset. Apparently she had asked for the visit and wanted to explain more concerns." The doctor suggested a follow-up visit with the child's primary care physician. When the father failed to take the child to that follow-up visit the next day, the mother again called the clinic. The note from this call states the mother reported

> she has concerns for suspected child abuse by father and [the department] is involved, they have a hearing tomorrow. . . . Advised [the mother] we are full and unable to work child in, and she could take the child to urgent care if she feels he needs to be evaluated. She s[t]ates her [department] worker told her the child needed to be evaluated by his PCP. Advised [the mother] medical providers are trained to look for signs . . . of child abuse and re-iterated if she has concerns she should take him to UC for suspected child abuse evaluation. She voiced understanding b[ut] was frustrated since the dad no showed today's apt and they have a[] court hearing tomorrow.

The mother's singlemindedness in this regard puts the child at risk of harm, as does her inability to regulate her emotions and interact appropriately with the service providers. *See, e.g.*, *In re K.S.*, No. 18-1759, 2018 WL 6705523, at *2 (Iowa Ct. App. Dec. 19, 2018) (finding mother's "inability to regulate her emotions and interact with others impedes her ability to provide adequate care for the children"); *accord In re O.N.*, No. 17-0918, 2017 WL 3525324, at *3 (Iowa Ct. App. Aug. 16, 2017). On this basis, there is sufficient evidence for the child's continued removal from the mother's care.

*C.*     *Conclusion*

We reverse the adjudication of K.G. as a child in need of assistance under Iowa Code section 232.2(6)(b). K.G. remains adjudicated a child in need of assistance under section 232.2(6)(c)(2), and we affirm his continued removal from the mother's care.

**AFFIRMED IN PART AND REVERSED IN PART.**

Bower, C.J., concurs; Greer, J., partially dissents.

**GREER, Judge** (concurring in part and dissenting in part).

I concur in part and dissent in part from the majority opinion. The first issue to resolve, as framed by the majority, is "whether [under Iowa Code section 232.2(6)(b) (2021)] there is clear and convincing evidence that the mother has physically abused K.G. or is imminently likely to do so." On this question, I concur with the majority that the State failed to prove the child's injuries were nonaccidental by clear and convincing evidence. *See In re L.H.*, 904 N.W.2d 145, 149 (Iowa 2017) (noting the State has the burden of proving its allegations by clear and convincing evidence). But as to the majority's conclusion that "K.G. is a child in need of assistance," I only concur because, as the majority points out, in her appellate brief the mother did not challenge the grounds for the child-in-need-of-assistance (CINA) adjudication under Iowa Code 232.2(6)(c)(2).

As for the question over the continued removal of the child from the mother, I dissent. True, procedurally the mother did not object to the continued removal of the child at the dispositional hearing or file a motion to reconsider the ruling, so she did not preserve error on that issue. *See State ex rel. Miller v. Vertrue, Inc.*, 834 N.W.2d 12, 20 (Iowa 2013) ("[E]rror preservation rules provide that error is preserved for appellate review when a party raises an issue and the district court rules on it."); *see also In re Long*, 313 N.W.2d 473, 476–77 (Iowa 1981) (holding that the dispositional order is a "final order" to appeal). "Although juvenile proceedings are to be conducted in an informal manner, we have applied [Iowa Rule of Civil Procedure 1.904] to juvenile court termination proceedings." *In re A.M.H.*, 516 N.W.2d 867, 872 (Iowa 1994) (applying rule 179.b, now renumbered rule 1.904). But in *In re B.E.*, we said:

> Further, because "[t]he parent-child relationship is constitutionally protected," we often bypass our error preservation rules in child welfare proceedings because of the important interests at stake. The right of a parent to companionship, care, custody, and management of his or her children has been recognized as far more precious than property rights and more significant and priceless than "liberties which derive merely from shifting economic arrangements."

875 N.W.2d 181, 187 (Iowa Ct. App. 2015) (alteration in original) (citations omitted). So, like the majority, I would reach the merits of the mother's challenge on appeal to the continued removal of the child from her care.

The reason the juvenile court gave in its dispositional order for the removal was that "placement of the Child outside of the home is necessary because continued placement in the home would be contrary to the Child's welfare to wit: *Child had injuries while in mother's care*." (Emphasis added.) Because we find that the State failed to prove the mother caused the injuries, I would conclude that continued removal of the child was not the least restrictive option and that the State failed to show by clear and convincing evidence that the child "cannot be protected from physical abuse without transfer of custody" or "cannot be protected from some harm which would justify the adjudication of the child as [CINA]." Iowa Code § 232.102(4)(a)(1), (2).

Section 232.2(6)(c)(2), the uncontested ground for adjudication, requires a showing that the child "has suffered or is imminently likely to suffer harmful effects" due to a "failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child." "[H]armful effects" relate to "the physical, mental, or social welfare of a child." *In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014) (quoting *In re Wall*, 295 N.W.2d 455, 458 (Iowa 1980)). The juvenile court did not find that code

section to be the basis of the continued removal; instead, the court required *both* parents to have psychosocial evaluations and to *both* comply with the child's counselor's recommendations about their communication with the child. What is more, the Iowa Department of Human Services (DHS) worker opined that both parents put K.G. in the middle. Here, other than discussing how the child might be impacted by both parents' behavior in the custody tug-of-war, the State failed to disclose any concrete harm to the child. Instead the focus appeared to be on the mother's behavior towards others—a mother who believed she was falsely accused of abusing her child. As the DHS worker testified:

> Q. Do you believe that at this point the removal should continue? A. I do.
> Q. Can you explain why? A. I guess I have concerns about the stability for [the mother] and how—that she won't accept answers that she does not necessarily agree with. She does become, it appears, very angered by those answers. She refuses to address how those injuries occurred.

The State's focus and ultimately the juvenile court's determination centered on the physical abuse concerns against the mother. We have determined the physical abuse was not a proper basis for the CINA adjudication; thus, we should not use it as a reason for the removal as the juvenile court did. And, in my view, but for the allegations of physical harm, this case would have been and should be resolved in the district court dissolution-of-marriage setting.